Dorrance's Estate.

Argued May 23, 1932. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Wm. A. Schnader,* Attorney General, with him *Francis T. Anderson, Wm. A. Gray* and *Herman J. Goldberg,* Deputy Attorney General, for appellant.—The sole question in this case is whether, after 1911, Dr. Dorrance again became domiciled in Pennsylvania, and whether at the time of his death, he was domiciled here. These questions must be decided under the law of Pennsylvania.

Domicile is the place at which a man has fixed his real family home and principal establishment for an indefinite time and not for a merely temporary purpose: Fry's Election, 71 Pa. 302; Carey's App., 75 Pa. 201; Hindman's App., 85 Pa. 466; Price v. Price, 156 Pa. 617; Lowry's Est., 6 Pa. Superior Ct. 143; Raymond v. Leish-

man, 243 Pa. 64; Winsor's Est., 264 Pa. 552; Blessing's Est., 267 Pa. 380; Barclay's Est., 259 Pa. 401.

The term "domicil" is derived from the Latin word meaning home, and the fundamental significance of home may be said to have fixed the fundamental meaning of domicile.

To acquire a domicile of choice, there must concur: (1) Physical presence in the place where the domicile is alleged to have been acquired; (2) Intent to make that place the home of the party. A domicile acquired by the concurrence of these two factors continues until a new one is acquired: Mitchell v. United States, 21 Wallace 350.

Declarations are decisive in determining domicile only if the declarant has two or more real family homes occupied at different seasons of the year: Winsor's Est., 264 Pa. 552; Graham v. Dempsey, 169 Pa. 460.

A domicile of choice once acquired cannot be lost by declarations alone: Dalrymple's Est., 215 Pa. 367; May v. May, 94 Pa. Superior Ct. 293.

An existing domicile is presumed to continue until a new one is shown to have been adopted, facto et animo, and, where a change is alleged, the burden of proving it rests upon whoever makes the allegation: Carey's App., 75 Pa. 201; Ennis v. Smith, 14 Howard 400; Mitchell v. U. S., 21 Wallace 350.

The burden of proving a change of domicile rests upon him who asserts it; but the burden shifts when it has been shown that the real family home has been moved: Price v. Price, 156 Pa. 617; Raymond v. Leishman, 243 Pa. 64; Williamson v. Osenton, 232 U. S. 619.

*Robert von Moschzisker,* with him *John B. Hannum, Jr.,* of *Hannum, Hunter, Hannum & Hodge, Schofield Andrews* and *Ellis Ames Ballard,* of *Ballard, Spahr, Andrews & Ingersoll,* for appellee.—An established domicile is presumed to continue until its abandonment is proved.

The burden of proving the abandonment of an established domicile and the acquisition of a new one is upon the person asserting the change: Price v. Price, 156 Pa. 617, 626; Barclay's Est., 259 Pa. 401.

A new domicile can be acquired only by physical presence at a new residence plus intent to make that new residence the principal home; but an established domicile can be retained without physical presence or residence, until it be proved that a new domicile has been acquired: Price v. Price, 156 Pa. 617; Barclay's Est., 259 Pa. 401; Lowry's Est., 6 Pa. Superior Ct. 143; Matter of Martin, 173 N. Y. App. Div. 1; Hindman's App., 85 Pa. 466; Dalrymple's Est., 215 Pa. 367.

A person is free to choose his domicile effectively provided the requisites of domicile exist in relation to the place of his choice. His choice of a new domicile will not be effective unless and until he establishes, through physical presence in the new locality, a residence with intent to make it his principal home. His choice to keep an established domicile will be effective, without physical presence or residence in that locality, up to the time, if ever, that he is proved to have abandoned it: Barclay's Est., 259 Pa. 401; Lowry's Est., 6 Pa. Superior Ct. 143.

An intention to stay at a given place indefinitely may fix that place, as one's domicile, but this depends upon other attending circumstances, which are absent in this case.

OPINION BY MR. CHIEF JUSTICE FRAZER, September 26, 1932:

This case comes before us on appeal by the Commonwealth from a decree of the Orphans' Court of Delaware County setting aside an appraisement of the estate of John T. Dorrance for transfer inheritance tax purposes. The decree of the court below was based upon a finding, after hearing, that decedent was domiciled in Cinnaminson Township, Burlington County, New Jersey, and not in Pennsylvania.

The appeal was taken under provisions of the Act of June 20, 1919, P. L. 521, and a preliminary question arises as to the scope of review in cases of this character. Appellees, who are executors of Dorrance's Estate, contend that although, under the Act of April 18, 1919, P. L. 72, the testimony becomes part of the record, upon an appeal on certiorari "we cannot weigh conflicting evidence further than to determine whether the decree appealed from is supported by any evidence and whether the court or judge had jurisdiction or authority to do the act complained of." Citing Walker's App., 294 Pa. 385. 389. While, in appeals on certiorari, this court will not usually overrule findings of fact which have evidence to support them, nevertheless we will review conclusions of law based upon undisputed facts: Hand's Case, 266 Pa. 277. The determination of decedent's domicile in this appeal is a conclusion of law, based upon facts, most of which are undisputed. Furthermore, this case falls within the rule stated in Hindman's App., 85 Pa. 466, 470, that where a finding of fact is simply a deduction from other facts reported by the tribunal under review, and the ultimate fact in question is purely the result of reasoning, we are competent to judge of its correctness and will draw our own conclusions from the facts as reported.

Dr. John T. Dorrance was born November 11, 1873, in Bristol, Bucks County, Pennsylvania, where he spent the early years of his life with his parents. In 1895 he graduated from the Massachusetts Institute of Technology, after which he attended the University of Göttingen in Germany, where he took his doctor's degree in chemistry. In 1897 he entered the employ of the Joseph Campbell Preserve Company in Camden, New Jersey, in which company his uncle, Arthur Dorrance, had a substantial interest. He remained with that firm and its corporate successor, the Campbell Soup Company, until his death.

At the start of his business career he established his residence at a boarding house in Camden, living there until 1905, when he moved to the Robeson Apartments in the same city. In 1906 he married Miss Ethel Mallinckrodt of Baltimore, Maryland, who survives him as his widow. Dorrance and his wife made their home at the Robeson Apartments until 1908, at which time they moved to Philadelphia and remained in that city until 1911. In 1909 Dorrance purchased a country place known as Pomona Farms in Cinnaminson Township, Burlington County, New Jersey. He later conveyed the title to this property to the Campbell Preserve Company and thereafter leased the premises from that company. Upon completion of alterations to the leased property, Dorrance and his family entered into possession on May 7, 1911, and the Commonwealth concedes that from this date until November 14, 1925, decedent's domicile was in New Jersey.

During the years which passed from the time of his first association with the Campbell Company, Dorrance rose rapidly in the management and control of the business. The company itself grew into one of the largest canning and preserving enterprises in this country. At the time of Dorrance's death in September, 1930, it employed between four and five thousand persons, and annually consumed in the business enormous quantities of vegetables and other farm products. Dorrance became the head of the company and from 1915 until his death was the owner of all its capital stock. In 1922 the company was reorganized as the Campbell Soup Company, a New Jersey corporation with offices in Camden. At the time of his death Dorrance had amassed an immense fortune, which both parties agree is to be estimated at a figure exceeding one hundred fifteen million dollars. ✓

In 1925 he purchased a large and attractive estate known as "Woodcrest" located in Radnor, Delaware County, Pennsylvania, in the suburbs of Philadelphia. The property was taken in the joint names of Doctor

and Mrs. Dorrance, and, including subsequent additions of surrounding acreage and furnishing of the mansion, the cost was approximately a million dollars. Speaking of the purchase of the Radnor Estate, Mrs. Dorrance, the widow, testified as follows:

"It was purchased so that our children would be more in contact with children and where they could go to school more easily with children with their prospects in life, and where we could do some entertaining for my oldest daughter who was then coming of age and who mingled with the world; and where I......would be nearer my associates." In 1925 the children comprised four daughters aged respectively, 18, 16, 14 and 10, and one son in his sixth year.

The house at Radnor was first occupied by the Dorrance family on November 14, 1925, at which time their entire personal effects were removed from Cinnaminson to Radnor. The Commonwealth contends that from this date until his death, almost five years later, Dorrance was domiciled in Pennsylvania. Despite an attempt on the part of the executors to demonstrate that the former home in New Jersey was maintained as the principal home and establishment of decedent, and that there was a mere occasional occupancy of the Radnor place, it is our opinion the evidence clearly indicates that from 1925 until the autumn of 1930, the Radnor Estate was the real and only home of the Dorrances, and except for occasional visits to Cinnaminson and sojourns in Bar Harbor, Palm Beach and other resorts, as well as trips to Europe, "Woodcrest" was occupied continuously by decedent and his family until his death, and at present is the family home. The place at Cinnaminson was retained in substantially the same condition as before the acquisition of "Woodcrest," but with the number of servants reduced from ten to two. It was occupied after 1926 by the mother and sister of Dorrance, who remained there until their deaths in 1928 and 1929 respectively. During their occupancy, one or two rooms in the house

were reserved for Dorrance and his wife and available for their temporary use at any time. The evidence is not convincing that Dorrance used the Cinnaminson residence for any extended period after removal of his family to Radnor. Undoubtedly he made occasional visits to the place, but these can be accounted for on several grounds: his mother and sister were both living there and eventually developed fatal illnesses; the Cinnaminson place was in the midst of the experimental farms of the soup company; above all, in addition to a claimed sentimental attachment to Cinnaminson, he was anxious to give color to his asserted intention to retain New Jersey as the place of his domicile.

Much of the vast amount of testimony and exhibits introduced by both appellant and appellees is immaterial to the issue, but there are a number of facts which, in our opinion, establish beyond question that continuously since 1925 the true home of Dorrance and his family was in Pennsylvania, and that the New Jersey residence was retained by him merely to lend weight to the fiction that he was domiciled there. Before 1925 Dorrance employed ten servants at Cinnaminson. After 1925 there were never more than four, and after the death of Dorrance's mother in 1929 only two. At "Woodcrest" sixteen servants were employed in the house and ten to twelve others worked on the grounds. There was a corresponding difference in the running expenses of the two properties. In 1924 the living expenses at Cinnaminson were slightly over twenty-nine thousand dollars. After 1925 the expenditures were considerably diminished and in 1929 amounted to approximately $6,500. On the other hand, the maintenance of the Radnor Estate exceeded $90,000 in 1929, and the year before amounted to approximately $95,000.

Although the comparative size of two residences is not conclusive of the fact of domicile, it is evidence of the intention to make one place the principal home. The expenditure of a very large sum of money for a residence

which is not adapted to nor designed for mere seasonal occupancy is strong indication of an intention to make it the principal residence and main establishment of the family, particularly where the new residence is more elaborate and pretentious than any former abode. A few figures will readily show the marked difference between the Dorrance estates. The Cinnaminson property consisted of approximately seven acres located in a country district and surrounded by truck farms. The homestead was more than fifty years old and had been remodeled in 1911. Although situated among fine old trees and surrounded by an extensive lawn, the house "was an ordinary brick mansard roof house of the time that it was built; very ugly," as Mrs. Dorrance testified.

On the other hand "Woodcrest" was considered one of the most beautiful estates in the suburbs of Philadelphia. It originally comprised 119 acres but subsequent additions to protect the boundaries brought the total acreage over 137. The house was an imposing stone residence of modern construction with six rooms and two lavatories on the first floor, and a large center hall which extended to the third floor. On the second floor there were ten rooms and five baths for the use of the family or their guests, and in addition twelve smaller rooms with two baths in the servants' quarters. The third floor consisted of five bed rooms, a nursery and two baths. There were several smaller buildings on the grounds which were used as living quarters by employees. There was also a garage capable of accommodating seven cars.

Included among the exhibits introduced by the executors were a number of photographs of the Cinnaminson property, showing the grounds as well as the interior of the house. The Commonwealth presented an air view of the Radnor Estate, but no pictures showing the property in greater detail. At the argument it was stated that the officers of the Commonwealth had been refused access to the grounds at "Woodcrest" for the purpose of taking photographs. The inference naturally arises that

a comparison of photographs of the two estates would indicate considerable disparity between them.

The testimony as to the time Dorrance spent with his family at Cinnaminson after 1925 is extremely vague and uncertain.  A fair conclusion from the evidence is that Dr. Dorrance and his wife made occasional trips to Pomona Farms remaining one or two nights at a time, and that upon their return from Bar Harbor or Jamestown at the end of the summers, a longer period was spent there, but only for the purpose of waiting until the servants had opened the Radnor house and made it fit for occupancy.  When leaving for Europe or starting on summer vacations their trunks and other baggage were sent from Radnor and shipped directly back to that place upon returning.  Considering the nature of the occupancy of the Radnor Estate, as well as the length of time spent there out of each year, all the facts clearly indicate that it was the principal establishment of Dorrance and his true family home after 1925.

The sumptuous residence in Pennsylvania was consistently chosen by Dorrance himself, as well as his wife and children, for all the outstanding events of their social life.  Dorrance gave a number of large dinner parties there for men, principally business associates and friends, at which more than sixty guests were usually present.  He and his wife entertained smaller groups for dinner quite frequently.  His children invited their friends to "Woodcrest" for parties.  One of his daughters was married in 1926 at the Radnor Church and the wedding reception was held at "Woodcrest"; another, who was at the debutante age, was presented to society at an elaborate affair there in 1929.

Servants who had been in the household during the period in question testified that, except when he was absent on vacations, Dorrance spent practically every night at his home in Radnor.  He traveled back and forth daily from Radnor to his office in Camden.  His weekends were spent at the Radnor place, several witnesses

testifying that Dorrance took great interest in his estate and on Sundays walked around the extensive grounds inspecting the property and conversing with caretakers. The children were entered in schools from the Radnor residence and with their mother regularly attended St. Martin's Church in Radnor Township. Dorrance himself did not transfer his membership to the Radnor Church but maintained his affiliation with a church in Riverton, New Jersey. This latter was only one of many things which he did to avoid the appearance of identifying himself with the community in which he resided with his family; and that these acts, together with his declarations of residence in New Jersey, were intended to bolster his assertions that he remained domiciled in New Jersey, there can be little doubt. His real motive and the reasons which prompted this course of conduct are apparent.

With a remarkable demonstration of the same business acumen and sagacity which enabled him to accumulate his enormous personal fortune, he carefully drew his wills (all except the last one previous to 1925), with the intent of retaining for his children, after his death, his 100% interest in the Campbell Soup Company. This he would be able to do under the laws of New Jersey by the accumulation of income for the payment of inheritance and estate taxes, and with the assurance that his wife could not elect to take personalty against his will, which would not be possible under the laws of Pennsylvania. In addition, it was a matter of considerable importance for him to declare himself a resident of New Jersey in respect to the payment of annual taxes on personal property, as his stock in the soup company, as well as United States and New Jersey government securities, were exempt from the tax in that state. By claiming a residence in New Jersey, Dorrance was able to effect a large annual saving in taxation. Taxation matters were discussed by him in his conversations with leading business men and bankers in Philadelphia and empha-

sized by his New Jersey counsel. For that reason, Dorrance informed others he hesitated to take up residence at Radnor, and when contemplating the purchase of "Woodcrest" he consulted his attorney, who advised him that retention of his New Jersey domicile "was largely a matter of intention." Consequently, following his removal to the estate at Radnor, he scrupulously endeavored to declare in formal documents and on many occasions that he was a resident of New Jersey. Upon the advice of his attorney he executed an agreement with his wife that their residence should remain at Cinnaminson despite the occupancy of "Woodcrest" during "a portion of each year." The agreement stated that both would refrain from voting elsewhere than in Burlington County, New Jersey, and contained other clauses of a similar nature. Dorrance refused to accept a directorship in the Pennsylvania Railroad until assured by the president of the company that it was not necessary for more than a majority of the directors of that corporation to be residents of Pennsylvania. On many occasions and in various formal documents executed after 1925 he stated his residence to be at Cinnaminson, but counsel for the Commonwealth has indicated several instances in which Dr. Dorrance did give his address as Radnor. Mrs. Dorrance was not as consistent as her husband in her declarations concerning residence. Her accounts with merchants and department stores indicated only the address at Radnor. All the members of the family were listed in the social register with address as Woodcrest, Radnor. In 1929, for the first time, the residence at Cinnaminson was included with that of Radnor.

A circumstance of considerable importance was the fact that after 1925 many of Dorrance's friends and acquaintances assumed he had become a resident of Pennsylvania. Dorrance discussed this with his lawyer, stating he had denied to them any intention of giving up his domicile in New Jersey. But in letters and con-

versations several of his friends expressed to him their belief that he had become a legal resident of Pennsylvania. The evidence shows that such belief was induced by the fact that his residence at "Woodcrest" had all the indications of a permanent home, both from the manner of his residence in that place and the continuous nature of his abode there.

We come now to an examination of the law applicable in determining the domicile of decedent. The precise question is as follows: May expressions of a man to the effect that he desires to retain a domicile of choice in one state, prevail over the intention to make a new home manifested by an actual removal to the new residence in another state, and accompanied by a manner of living which can leave no doubt that the new abode is the principal residence and establishment, particularly where the wish to retain the old domicile is colored by the motive of regulating his affairs after death in a manner not permitted by the laws of the state removed to, and is also bound up with the purpose of avoiding payment of substantial taxes on personal property? We are of opinion that such is not the law and that John T. Dorrance was domiciled in Pennsylvania at the time of his death.

In holding that Dorrance was domiciled in New Jersey, the learned judge of the court below based his decree on the legal proposition that where a man has more than one residence, he may choose for his domicile whichever one of them he pleases. He further held that an existing domicile may be retained, although residence is given up entirely and a new residence taken up at a new place, simply because there was no intention to acquire a new domicile at the new place of residence. These principles may be acceptable as good law in particular cases; we are, however, of opinion that they are not applicable to the facts under consideration here. None of the Pennsylvania cases cited in the opinion of the lower court or referred to us in the briefs of counsel is suffi-

ciently similar on its facts to be controlling in the present situation. At most they contain helpful generalizations on the law of domicile. The leading cases can be clearly distinguished. Fry's Election Case, 71 Pa. 302, held that the temporary residence of students in a college town was not sufficient to establish a domicile for voting purposes. In Carey's App., 75 Pa. 201, decedent was held domiciled in the last place in which he had established a residence of more than temporary character. Price v. Price, 156 Pa. 617, decided that absence from a domicile of choice because of serious illness would not result in the acquisition of a new domicile. In Dalrymple's Est., 215 Pa. 367, it was held there was no change of domicile where the intention was not supported by an actual change of habitation. Raymond v. Leishman, 243 Pa. 64, was a foreign attachment case and is not in point. In Barclay's Est., 259 Pa. 401, decedent was held domiciled in Pennsylvania because there was no clear evidence of the establishment of a permanent residence in Ohio. Winsor's Est., 264 Pa. 552, is discussed elsewhere in this opinion. Perhaps the Pennsylvania case most nearly in point is Blessing's Est., 267 Pa. 380, in which decedent owned two residences, one in Philadelphia County and the other in Montgomery County. The house in the city was boarded up and little used. In a per curiam opinion, we held that decedent's intention to be domiciled in Philadelphia could not prevail over the fact of his actual residence with his family in Montgomery County.

With a few scattered expressions to the contrary, the law is generally settled that, as regards the determination of domicile, a person's expression of desire may not supersede the effect of his conduct. "Apart from possible exceptions, a man cannot retain a domicile in one place when he has moved to another and intends to reside there for the rest of his life, by any wish, declaration or intent inconsistent with the dominant facts of where he actually lives and what he actually means to do":

National City Bank v. Hotchkiss, 231 U. S. 50, 56; Dickinson v. Brookline, 181 Mass. 195. See also Thayer v. Boston, 124 Mass. 132. "Every person must have a domicile somewhere and a man cannot elect to make his home in one place for the general purposes of life, and in another place for the purposes of taxation": Feehan v. Tax Commissioner, 237 Mass. 169, 171. "A declaration [as to domicile] that is self-serving and not followed by acts in accordance with the declaration will not be regarded as conclusive, but will yield to the intent which the acts and conduct of the person clearly indicate": In re Paris's Est., 176 N. Y. S. 879, 882.

The legal effect of one's acts in contradistinction to an expressed intention in regard to domicile is well stated in the case of Pettit's Exrx. v. City of Lexington, 193 Ky. 679, 683, as follows: "The location of one's legal residence is, as we have seen, a question of fact and intention, and the fact as exhibited and the intention as inferred or expressed must coincide in the conclusion. It should also be noted that neither of these elements can exercise a controlling effect, though intention may arise from the established fact; as where one's conduct conclusively shows his residence to be in one place, his expressed intention that it shall be in another place may not override the fact so as to locate it there. The intention in that case will be inferred from residence alone in the face of contrary expressions of purpose."

In that case, which was a proceeding to determine the legal residence of decedent for assessment of personal property for city taxes, it appears decedent had a house in which he lived at 801 East Main Street, Lexington, Kentucky. He subsequently purchased a farm outside the city, known as the Tod Hunter place. Although he spent considerable time at the country place and in deeds and formal documents expressed his intention to fix his legal residence there, from the facts as to his mode of living, the court decided he was domiciled in Lexington. On page 684 of the opinion the court states:

"The spending of a short time each summer in the country under conditions less comfortable than those under which he lived in the city, the voting from the Tod Hunter place, a few times, and the refraining from registering and voting in Lexington were all acts performed by him with the view of manifesting what he doubtless conceived to be conclusive evidence of the establishment and maintenance of a residence at the Tod Hunter place. But those acts in our opinion are not sufficient evidence of the intention to overcome that to be inferred from the fact of his actual residence at 801 East Main Street and his doing of those things at that place that one usually and normally does in establishing and maintaining a home and legal residence."

Another equally strong decision from the Supreme Court of Kentucky is Baker v. Baker, Eccles & Co., 162 Ky. 683, affirmed in 242 U. S. 394. At page 709 the former court said: "If the place of Baker's residence had to be determined alone by intention manifested in speeches without any reference to the acts and conduct ......, we would have little doubt in adjudging that he never lost his legal residence in Tennessee and only had an actual residence in Paducah for the purpose of conducting the business in which he was there engaged, all the while having it in mind to return to Tennessee when the objects of his sojourn in Paducah had been accomplished. But when we turn to the other side of the case, we find abundant reason for the opinion that.....he not only had an actual residence in Paducah, but acquired a legal residence there, which he retained until his death." See also City of Lebanon v. Biggers, 117 Ky. 430; Bartlett v. New Boston, 77 N. H. 476; Tax Collector of Lowell v. Hanchett, 240 Mass. 557; Babcock v. Slater, 212 Mass. 434.

If we turn to the English decisions, the law is the same. In Douglas v. Douglas, L. R. 12 Eq. 617, WICKENS, V. C., lucidly remarks: "It seems to me, as it did to Vice Chancellor JAMES in Haldane v. Eckford, L. R. 8 Eq.

631, that the intention required for a change of domicile, as distinguished from the action embodying it, is intention to settle in a new country as a permanent home, and that if this intention exists and is sufficiently carried into effect, certain legal consequences follow from it, whether such consequences were intended or not, and perhaps even though the person in question might have intended the exact contrary." See also Moffett v. Moffett, (1920) 1 Ir. Rep. 57, 65. In the quotation given above, the change of domicile was from one country to another. A fortiori the decision is applicable to a change of domicile as between states, since it is elementary law that a national domicile is less easily lost than a municipal or quasi national one.

In Lord HALSBURY's "The Laws of England," volume VI, page 186, under the general topic of Domicile, it is stated: "If residence and the intention that it shall be permanent are both present, a domicile is acquired even in the face of express declarations of a desire to retain the old domicile." Again, at page 187 of the same volume, is the following: "Expressions of intention, written or oral, may be given in evidence, but such evidence must be carefully weighed in connection with the context in which it occurred, and even if the expressions are clear and consistent they cannot prevail against a course of conduct leading to an opposite inference."

The celebrated English author, A. V. Dicey, whose statements concerning the law of domicile are frequently quoted with approval in this country (see Williamson v. Osenton, 232 U. S. 619), in his book "Conflict of Laws," 4th edition, page 133, says: "Direct expressions, however, of intention may be worth little as evidence. The person who uses them may not know what constitutes a domicile. He may call a place his home, simply because he often lives there. He may wish to be, or to appear, domiciled in one country, while in fact residing permanently and intending so to reside, i. e., being domiciled, in another. A direct statement, in short, that D

considers himself domiciled, or to have his home in France, though it may sometimes be important, may often carry little weight. This remark specially applies to the description which a person gives of himself in formal documents as, e. g., 'D residing in France.'"

At page 106 of the same volume he says: "A person's wish to retain his domicile in one country will not enable him to retain it, if, in fact, he resides with the animus manendi in another." Citing In re Steer (1855) 3 H. & N. 594. In commenting on this statement in a footnote on the same page, the learned editor of the fourth edition adds the following: "Can an Englishman, i. e., one domiciled in England, live permanently in Scotland and retain his English domicile, because he does not wish to subject himself to limitation of his testamentary capacity? No case has yet decided this in the affirmative; if so held, then domicile must be reinterpreted as depending on intention primarily, and only in a minor degree on residence, the intention not being of residence but of falling under a legal system affecting status."

The learned judge of the court below, in holding Dorrance was domiciled in New Jersey at the time of his death, gave too much weight to the declarations of intent contained in his will and other documents. The Pennsylvania cases do not support the proposition that a declaration in a will is "well-nigh conclusive." That may be true where there is no satisfactory evidence indicating intention to make a permanent home in any one place, as was the situation in Appointment of Guardian for Belle N. Nicholls, 86 Pa. Superior Ct. 38, and such rule would also apply where decedent had two residences almost alike in size and costliness, and spent practically six months of the year in each, as in Winsor's Est., 264 Pa. 552. The general rule, however, is that recitals in deeds and wills are not given particular weight in determining domicile in comparison with the evidence supplied by the daily life of the individual and his acts and conduct. "Nor are the recitals in his will and some of his deeds

sufficient to fix his domicile. They are not controlling when contradicted by other facts and circumstances": Dalrymple's Est., 215 Pa. 367, 371, quoting Jacobs on Domicile. "More weight will be given to a person's acts than to his declarations, and when they are inconsistent, the acts will control": 19 C. J. 438; see also 21 Am. & Eng. Ann. Cases, page 206. "That acts speak louder than words is sound law as well as proverbial wisdom": Graham v. Dempsey, 169 Pa. 460, 462. "On the question of domicile, less weight will be given to a party's declarations than to his acts": Holt v. Hendee, 248 Ill. 288, 296. "While residence in this case [naturalization proceedings] depends largely on intention, the intention is to be gathered from the acts of the petitioner rather than from his declarations": In re Barron, 26 F. (2d) 106, 107; see also In re Tallmadge, 181 N. Y. S. 336; Curtis v. Curtis, 185 App. Div. 391, 396; Matter of Mesa y Hernandez, 149 N. Y. S. 536, affirmed 172 App. Div. 467; and see specially Rosenberg v. Commissioner of Internal Revenue, 37 F. (2d) 808.

In holding that a domicile of choice may not be retained by intention alone, we do not mean to disturb the well settled rule that absence from a place of legal residence, for purposes of health or other unavoidable necessity, will not result in a loss of that domicile. See Price v. Price, 156 Pa. 617; Pickering v. Winch, 48 Oregon 500. Nor do we mean that where a man has two actual residences, either one of which might be his domicile, he is not free to choose between them. See Winsor's Est., 264 Pa. 552; Chambers v. Hathaway, 187 Cal. 104; Dunn v. Trefry, 260 Fed. 147.

Counsel for executors rely particularly on Frick's Est., 190 N. Y. S. 262. Neither this case nor In re Lyon's Est., 191 N. Y. S. 260 (which is even stronger but not cited in the briefs) is an appellate court opinion and for that reason they are not entitled to much weight here, but particular circumstances in the present case distinguish it clearly from those just cited. In those

cases neither the presence of an ulterior motive nor the task of attempting to reconcile declarations which were inconsistent with conduct interfered with the New York court in determining that there was no intention on the part of the persons involved to change their true home, or to make a new residence their principal establishment and "technically preëminent headquarters." In the Frick Case, Surrogate Foley said: "Counsel for the tax commission gives full credit to Mr. Frick's honest belief that he was a resident of Pennsylvania. It is conceded also, that no question of the evasion of the payment of a tax in New York is involved here." In the case of Dr. Dorrance, we have observed he from time to time expressed the belief that he was a resident of New Jersey. On the contrary his acts show a studied attempt to create evidence tending to indicate a legal residence in New Jersey. If he really believed he was a New Jersey resident after 1925, it seems unnecessary for him to have entered into an agreement with his wife concerning the matter, or to have secured his appointment as a member of a commission to investigate the question of compulsory insurance for motor vehicles within the State of New Jersey, or to have written his most intimate friends and associates that he was not a Pennsylvanian.

An attempt was made by counsel for appellees during the argument and in the briefs to show that Dorrance at no time intended to make his Radnor Estate a permanent home and that he contemplated returning to Cinnaminson at an indefinite future time. Assuming such to be the case, there is no doubt that such vague intention of resuming a former domicile will not prevent the acquisition of a new one. "If a person changes his domicile without any present intention of removing therefrom it is none the less his domicile, although he may entertain a floating intention to return, or to move somewhere else at some future period. . . . . . If there be both actual residence and intention of remaining—the animus manendi—then a domicile is established": Worsham v.

Ligon, 144 G. 707. "If a person has actually removed to another place, with an intention of remaining there for an indefinite time, and as a place of fixed present domicile, it is to be deemed his place of domicile, notwithstanding he may entertain a floating intention to return at some future period": Gilbert v. David, 235 U. S. 561, 569, quoting Story's "Conflict of Laws." "The requisite animus is the present intention of permanent or indefinite residence in a given place or country, or negatively expressed, the absence of any present intention of not residing there permanently or indefinitely": Price v. Price, supra, page 626. See also Attorney General v. Pattinger, (1861) 30 L. J. Ex. 284.

Having now ascertained that intention alone cannot defeat the acquisition of a new domicile where other facts show a change of domicile has actually occurred, it remains to consider whether the evidence in this case is sufficient to warrant a finding that Dorrance was domiciled in Pennsylvania, as contended by appellant. It is true the burden of showing a change from a former domicile is upon the party asserting it, but the fact of residence in a particular place is prima facie evidence of domicile. (As to burden of proof in such case see Collins v. City of Ashland, 112 Fed. 175.) The Commonwealth having established by adequate evidence that, at the time of his death, Dorrance had an actual residence in Pennsylvania, it was incumbent upon the executors to rebut the presumption arising therefrom by satisfactory proof that he resided in New Jersey or that the Pennsylvania residence was intended merely for a temporary purpose. This, in our opinion, they have failed to do.

It is argued by appellees that before a new domicile of choice can be acquired there must be proof of the abandonment of the old. In our opinion this contention is unsound, for the intention to make one's home in a new place necessarily includes the abandonment of the former home. This thought is clearly expressed in Ford v. Peck, 116 Kan. 74, 76, as follows: "It is elementary

law that change of domicile, as from Oklahoma to Salina, Kansas, involves two things, designated by classical authors as the factum and the animus. There must be transfer of bodily presence to another place, represented in the statutory definition by adoption of a place of habitation; and there must be intention to abide at the new location, either permanently or indefinitely, represented in the statutory definition by intention of returning when absent. Sometimes the animus is treated as involving two separate intentions, one to abandon the old location, and one to abide in the new. *If the last intention be formed, it necessarily includes the other.* The factum and the animus must finally coexist. Neither alone is enough; but the animus may follow the factum in point of time and, should that occur, the change of domicile is complete." (Italics ours.)

One of the most satisfactory definitions of domicile is that stated by Story in his "Conflict of Laws": "By the term domicile in its ordinary acceptation is meant the place where a person lives or has his home. In a strict legal sense that is properly the domicile of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning." To acquire a domicile of choice two things must concur: "(1) Physical presence in the place where domicile is alleged to have been acquired; (2) Intent to make that place the home of the party": Goodrich "Conflict of Laws," page 30; Carey's App., 75 Pa. 201; Fry's Election Case, 71 Pa. 302. "If the intention of permanently residing in a particular place exists, a residence in pursuance of that intention, however short, will establish a domicile": Price v. Price, supra.

We are not impressed with the argument that Dorrance owed a moral obligation to the State of New Jersey by virtue of having accumulated his vast fortune there, or in the words of appellees, that "both in law and

in justice New Jersey was entitled to tribute from John T. Dorrance, while to Pennsylvania he owed no such debt." The large profits which came to him through his ownership of the Campbell Soup Company represented the results of nation-wide sale of his products. His money was acquired from the country at large and not from any particular state. Moreover, Dorrance was by birth a Pennsylvanian. Even after his marriage he lived in this State three years before locating in Cinnaminson. When he came to Radnor to live in 1925 he was not only resuming his domicile of origin, but was purposely making his home in a neighborhood more congenial to his family and more suitable to his position in life than the New Jersey location which he left. It is appropriately stated by the Supreme Court of the United States in the recent case of Lawrence v. State Tax Commission, U. S. Sup. Ct. Advance Reports, 1931-2, No. 13, page 720: "Enjoyment of the privileges of residence within the state, and the attendant right to invoke the protection of its laws, are inseparable from responsibility for sharing the costs of government."

From what we have said and quoted above, it clearly appears that by the act of removing his home and family from New Jersey to Pennsylvania, Dorrance acquired a domicile in the latter state. That he was unaware that such action would result in a change of domicile is irrelevant to the issue. His intention to maintain a home, indeed a very lavish home, at Radnor, is undoubted. We fail to find in the record, after careful search, any convincing testimony of a bona fide intention upon his part or that of any member of his family, to occupy "Woodcrest" for any other than an indefinite period, and in fact to make it the "technically preëminent headquarters" of himself and family after November, 1925. "The intention required for the acquisition of a domicile of choice is an intention to make a home in fact, and not an intention to acquire a domicile:" Restatement of the

Law of Conflict of Laws, section 21.* The evidence indicates that beyond all question Dorrance's family home and principal establishment was at Radnor. When either he or the members of his family went away on vacations they started from "Woodcrest" and returned there afterwards. Practically his entire time, except when absent on vacations, was spent there. His friends and acquaintances considered it his home. Indeed we may readily believe that in his heart Dr. Dorrance knew "Woodcrest" to be his true and only home, but for personal reasons he preferred to state in public that it was not his home when every fact and circumstance pointed to the contrary. As already indicated, his mere declarations, undoubtedly made solely for personal reasons, did not prevent the acquisition of a domicile in Pennsylvania. In our opinion the evidence clearly establishes the legal domicile of Dr. Dorrance to be in Pennsylvania and accordingly there is due the Commonwealth an inheritance transfer tax, based upon the agreed value of his estate at the time of his death.

The decree of the court below is reversed and the appraisement, subject to modifications indicated by the Commonwealth's stipulation as to the value of the estate, is reinstated; the costs to be paid by appellees.

DISSENTING OPINION BY MR. JUSTICE SCHAFFER:

It seems to me that the majority opinion does not give that full weight to the intention of the decedent which should be given. In determining where a man's domi-

---

* See Treatise No. 1 (a) Supporting Restatement No. 1, (1925) the American Law Institute, at page 67, "It is not enough that a man desires to acquire or to keep a 'legal residence' or 'legal domicile'; the intention necessary for the acquisition of a domicile is an intention as to the fact, not as to the legal consequences of the fact. 'A man's home is where he makes it, not where he would like to have it.' ...... The intention requisite for domicile is the intention to have a home, and that is the only legally relevant intention; the domicile follows as a legal consequence, without regard to whether the consequence is desired or not."

cile is there are two factors which are absolutely controlling: One is the actual fact of residence and the other is the man's intention to make that residence his home. As to this all authorities agree. But where, as in the case before us, the man has two residences, at each of which he spends part of his time, and each of which is fully maintained and equipped to be his home, the factor of residence is equivocal and for that very reason cannot be determinative of domicile. Consequently, in such a situation, we look to the other necessary factor, which is intention, as the factor of preponderant importance: Winsor's Est., 264 Pa. 552; Fry's Election Case, 71 Pa. 302; In re Guardian for Nicholls, 86 Pa. Superior Ct. 38; Hunnings v. Hunnings, 55 Pa. Superior Ct. 261; Thayer v. Boston, 124 Mass. 132; American Law Institute, Restatement, "Conflict of Laws," section 26 and comment thereto; 19 C. J. 405-406 ("Domicile," section 13); Jacobs on the Law of Domicile, (edition 1887), sections 421-424; Minor, Conflict of Laws, section 64, (page 123); 1 Wharton, Conflict of Laws, (3d edition), 144, (section 69). These authorities likewise stand for the proposition that where the proofs on either side are balanced, the claim of the earlier residence to be the domicile should prevail.

Until he purchased the Radnor residence, Dr. Dorrance had been domiciled at Cinnaminson in the State of New Jersey for fourteen years. The question then for decision is, did he abandon his domicile there and acquire one in Pennsylvania? The Cinnaminson property is the kind of one in which a man of Dr. Dorrance's wealth and position could appropriately live. Until he bought the Radnor place, it met all of his requirements as a home, but apparently did not meet the social desires of his family. To gratify their wishes, he purchased the Radnor house, but never closed the one at Cinnaminson. He lived in the Radnor house more than he did in the New Jersey one, but never permitted it to be occupied by anyone except his mother and sister for a short time.

While they were there, he reserved quarters for himself and his family. He always kept the Cinnaminson house heated, in repair, with servants there, fully maintained as a residence. During the last three years of his life, it was the only one of his residences which was open throughout the whole of each year. He was living in the Cinnaminson home when he died.

By every spoken declaration which he made, and by almost his every act, except the mere purchase of the Radnor house and his occupying it himself more than he occupied the one at Cinnaminson, he indicated that he had not intended to change his domicile. The following circumstances, in addition to his spoken words, indicate that he did not intend to abandon his New Jersey one:

All his interests were in New Jersey, where he had made his great fortune. While he did not actually own the large area of land in New Jersey which was tributary to his business, in effect he did, because he owned all the capital stock of the Campbell Soup Company, which in turn owned the land.

Before purchasing the Pennsylvania property, he consulted his New Jersey counsel to ascertain whether or not this purchase and the occupancy of the Pennsylvania property would cause him to lose his domicile in New Jersey. He was advised that he would not lose it, if in purchasing the Radnor place and living there, it was not his intention to abandon his home at Cinnaminson. This is a powerful piece of evidence on the question of his intent.

It was important to him that he keep his New Jersey residence in order that the trusts which he intended to create out of his fortune should be maintained under New Jersey law in order to carry out his purposes, and also important in the matter of taxes which his estate would be called upon to pay if he became domiciled in Pennsylvania. It was also important to him, and as to this he inquired, because, under the New Jersey law, his

wife could not take against his will, and if he was domiciled in Pennsylvania, she could. In his will and in all the codicils, he recited himself as domiciled in the State of New Jersey. This is true of all wills which he signed. He expressly directed that his will should be probated in New Jersey.

He continued to receive his personal mail from a New Jersey post-office as he had done in the past. He stayed frequently at Cinnaminson, and his wife and children also stayed there, but less frequently. He expressed a dislike for the place at Radnor and affection for the place at Cinnaminson. Shortly before his death, he made definite and detailed plans for additions and improvements to the place at Cinnaminson. He paid his poll tax every year in New Jersey. He and his wife voted at Cinnaminson whenever they did vote and he never voted in Pennsylvania. He maintained his church affiliations in New Jersey and continued to act as senior warden of the church at Riverton in that state, which office under the church law he could hold only if he was domiciled in the parish. He always paid his personal tax in Cinnaminson Township and never paid personal taxes in Pennsylvania, making an affidavit on a Pennsylvania property tax return sent to him in 1926 that he was a resident of New Jersey.

He made numerous declarations to the effect that his home was in New Jersey and his place at Radnor simply a show place for the social pleasures of his wife and children, that he was a resident and citizen of New Jersey and intended always to so remain. He so badged himself in applying for passports and when he took the oath of office as a director in a bank in New Jersey. He declined election to the board of directors of the Pennsylvania Railroad Company until he was assured that he could under the law be elected and serve as a resident of New Jersey.

What more could a man do who has two homes and who wishes to retain the older one as his domicile?

Where a man has a domicile, he does not lose it unless he abandons it. To me the testimony overwhelmingly indicates that the Cinnaminson property was just as much an actual residence of Dr. Dorrance as was the house in Radnor and that his intention to keep Cinnaminson as his permanent home remained unchanged to his death. Where a man has two actual residences, he is free to choose between them. This the majority opinion recognizes, because it says: "Nor do we mean that where a man has two actual residences, either one of which might be his domicile, he is not free to choose between them."

In Price v. Price, 156 Pa. 617, 626, we said: "Domicile of origin must be presumed to continue until another sole domicile has been acquired by actual residence, coupled with the intention of abandoning the domicile of origin." Whether the established domicile was one of origin or choice can make no difference in principle.

New Jersey has insisted that he was domiciled there and has collected taxes from his estate on the basis of this claim. Had the situation been reversed and had he lived in Pennsylvania in the manner he did in New Jersey, it is manifest to me that Pennsylvania could rightly claim he was domiciled here and not in New Jersey, just as it did in the case of Henry C. Frick, and as the New York court decided it could in Matter of Frick, 116 N. Y. Misc. Rep. 488, 190 N. Y. Supp. 262.

I would affirm the decree of the court below.

DISSENTING OPINION BY MR. JUSTICE KEPHART:

In disagreeing with the majority opinion, which I do reluctantly, it is only because a careful consideration of the entire record convinces me that the Commonwealth has not met the burden of proof imposed by the circumstances of this case. It also demonstrates to my mind the efficacy of the rule that the findings and conclusions of the trial court should be accepted unless they are un-

supported by evidence or are at direct variance with established law.

It is my opinion that the decision of the majority is opposed to the established law, and unsettles it as related to domicile. It makes the determination of that question more concerned with the length of time one may spend in the places claimed as residences or domiciles than with the intent to establish a domicile or retain a status already acquired.

It is admitted that Dr. Dorrance was domiciled in Cinnaminson prior to 1925. The burden then rested on the Commonwealth to show that this domicile had been abandoned. While section 17 of the American Law Institute, Restatement, "Conflict of Laws," states, "To acquire a domicile of choice, a person must establish a dwelling-place with the intention of making it his home," and "The fact of physical presence at a dwelling-place and the intention to make it a home must concur; if they do so, even for a moment, the change of domicile takes place," yet the converse of this proposition is true in relation to losing a domicile once established. To retain it the intention must persist to make it a home, and physical presence even for a moment concurring with that intent will be sufficient to preserve that status. Measured by such a rule the estate of Dr. Dorrance easily sustains its case.

The Commonwealth, being required to show that his domicile at Cinnaminson had been abandoned, and that he intended to make Radnor his permanent home or "preëminent headquarters," cannot assume that because he built a fine residence at Radnor with a more expensive maintenance cost he intended such abandonment or to acquire a domicile at Radnor. Neither the size of the building, the number of servants nor the expenses connected therewith are persuasive as showing abandonment of a domicile long acquired and retained through acts which show a positive intention to hold such domicile. Nor may the fact that much of the family's social

life centered about the new residence be so considered. All such acts are consistent with and not hostile to the retention of domicile in New Jersey. During the summer and winter his residence was at Bar Harbor, Jamestown, Palm Beach, or abroad; the Radnor residence was closed when the family went away in the summer, but Cinnaminson was kept open the year round to receive him and his family. How much of the balance of the time he spent at either of these places does not definitely appear. It is certain, however, that much of that time was spent at Radnor, but the length of time spent at any particular place does not determine domicile. Concurrent with physical presence in a place for any time, there must be the intent to make the place a home. Intention is a state of mind, evidenced, it is true, by acts, but it may be shown by words as well.

The majority opinion speaks rather censuringly of Dr. Dorrance because he desired to retain New Jersey as his residence rather than Pennsylvania. His efforts in that direction are styled as "a *claimed* sentimental attachment," "to give color to his assertion," "to bolster his assertion that he retained domicile in New Jersey." His church affiliation is described as being "to avoid the appearance of identifying himself with the community in which he resided with his family." He wished to retain New Jersey citizenship because in that state his taxes would not be as heavy as in this State. I cannot see any good reason why a man should be censured when he wishes to avoid a heavy tax rate such as we have in this State, even if it is necessary for him to live in another state. It is not contrary to law to reside in New Jersey rather than Pennsylvania, even if the real purpose is to avoid taxes. "If one has the legal right to do a particular thing, the law will not inquire into his motive for doing it": Beirne v. Continental-Equitable Title & Trust Co., 307 Pa. 570; Vetter's Est., 308 Pa. 447. Moreover, even these criticisms emphasize the deliberate intention to retain his domicile in New Jersey. He had

his domicile there, wished to retain it, and while he wished to have a residence in Pennsylvania, surely the fact of his acquiring this residence should not impose on him the obligation of our citizenship with the resultant liability for our taxes.

Dr. Dorrance had other reasons for wishing to remain a resident of New Jersey. Our laws as to the devolution of property are different from theirs, as are also our laws with regard to the execution of trusts.

I cannot see Dr. Dorrance's residence in Pennsylvania as other than a "show place," as Mr. Justice SCHAFFER has stated. It was an additional place of abode where he and his family might entertain on a larger scale than was possible at the New Jersey home, and where they might be nearer the social life of Pennsylvania. If the penalty for such acts in Pennsylvania is to be assessed with our death taxes, it seems to me that Pennsylvania is assuming a very difficult rôle in the sisterhood of states. . Radnor was not the home of Dr. Dorrance, nor was it his domicile, and whatever his wife or his children might have thought proper or convenient in this respect, and whatever they did, should not be visited on Dr. Dorrance; nor should that be held conclusive in preference to acts in which he did everything in his power to retain his residence in New Jersey. See Mr. Justice SCHAFFER'S dissenting opinion on the facts. He not only voted there, he had his church residence there, he was assessed there for personal property taxes, he was appointed by the governor of that state on a commission, and all his documents on which his address was necessary named New Jersey as his residence.

While the case might seem difficult in some of its aspects, it seems to me that the majority opinion has lost sight of what Dr. Dorrance himself did, and has stressed too heavily what his family did.

I would affirm the judgment of the court below.