## Kelly Nomination

*Richard B. Gilardi* and *Thomas L. Cooper,* for petitioner.

*Harold R. Schmidt* and *John E. Rose, Jr.,* for respondent.

KREIDER, P. J., April 13, 1970.—This opinion sets forth the reasons for our order filed April 6, 1970, in which we dismissed the petition of Rocco Viola, Esq., to set aside the nomination petition of James B. Kelly, 3rd, a candidate for the Republican nomination for the office of representative in the General Assembly of Pennsylvania for the Twenty-eighth Legislative District, Allegheny County. Prior to entering that order, a two-day hearing was held at which the objector and the candidate appeared in person and were represented by counsel.

The objector's petition is based upon the allegation that the respondent, Kelly, was domiciled in Virginia from May 1, 1968, through January 31, 1970, and, therefore, was ineligible to become a candidate because he could not meet the constitutional require-

ment that legislators must be domiciled in Pennsylvania four years and in their respective districts one year next before their election.

Article II, sec. 5, of the Pennsylvania Constitution provides:

"Senators shall be at least twenty-five years of age and Representatives twenty-one years of age. They shall have been citizens and inhabitants of the State four years, and inhabitants of their respective districts one year next before their election (unless absent on the public business of the United States or of this State, and shall reside in their respective districts during their terms of service)."

The objector averred in paragraph tenth of his petition that the respondent-candidate did not:

(a) maintain a physical place of abode in the Commonwealth;

(b) maintain any of his belongings within the Commonwealth;

(c) pay any taxes to the Commonwealth or any of its political subdivisions;

(d) register for the Selective Service System in the Commonwealth;

(e) subscribe to any utilities;

(f) obtain a driver's license or register a motor vehicle in the Commonwealth;

(g) file his Federal tax returns in the Commonwealth;

(h) participate in community affairs;

(i) participate in the election process prior to the November election of 1968;

(j) and that he maintained a residence in the State of Virginia during the years 1968 and 1969.

In paragraph eleventh, the objector averred that:

". . . James B. Kelly III is not a resident or inhabitant of Sewickley Hills Borough, of the 28th Legislative District since he has never registered or

paid the wage tax imposed by Sewickley Hills Borough on its residents and inhabitants."

And in paragraph twelfth:

". . . that James B. Kelly, 3rd, registered to vote with the Allegheny County Election Department on August 30, 1968 and that said registration was improper for the reasons set forth herein and for the reason that he did not reside in the district for which he registered."

Respondent-candidate filed an answer denying the material averments of the objector's petition and averred that between the years 1964 and 1970 he was a permanent resident, inhabitant and domiciliary of Pennsylvania and of the Twenty-eighth Legislative District and that his absences from Pennsylvania while in Europe and Virginia were solely for business reasons and were temporary in nature.

A review of the various places of residence of respondent clearly discloses that he has deep roots in Allegheny County, Pa. James B. Kelly, 3rd, is 28 years old, having been born May 28, 1941, in Squirrel Hill in the Fourteenth Ward of the City of Pittsburgh, Allegheny County, Pa. He lived there with his parents until January 1942 when his father went into the military service and traveled to various places. During this period, Kelly's legal residence was with his grandfather, Henry Yates at the Park Mansions, also in the Fourteenth Ward of Pittsburgh. From April 1943 until July of 1945, respondent lived with his parents in Sewickley Borough, which is in the Twenty-eighth Legislative District, Allegheny County, Pa.

During the next 10 years, from 1946 to 1956, respondent lived at Squirrel Hill, Pittsburgh, and from 1956 to 1957 in Fox Chapel, Allegheny County. From 1957 to 1959, he lived with his parents in Middleboro,

Ky., where he registered in the military service of the United States.

In August 1959, he returned with his parents to live in Sewickley Borough where his father died in April of 1960. Thereafter respondent, then 19 years of age, moved with his mother to the Borough of Edgeworth, Allegheny County, which is adjacent to Sewickley Borough. Following his mother's remarriage, the family moved to Season Hill Farm in the Borough of Sewickley Hills, which is also in the Twenty-eighth Legislative District in Allegheny County. At that time, an addition was constructed to the house to accommodate respondent and his brother.

After respondent's graduation from Virginia Polytechnic Institute in 1963 and the American Institute of Foreign Trade in Phoenix, Ariz., in 1964, he lived in his home at Season Hill Farm until he secured employment with the Chicago Bridge and Iron Company at Oakbrook, Ill. Following a six-months training period at Greenville, Mercer County, Pa., respondent was sent to Chicago to work at the home office prior to being sent to Europe.

During this period, most of respondent's personal belongings remained at his home in his mother's house in Sewickley Hills Borough.

THE EUROPEAN ASSIGNMENT

From September 1965 to March 1968, respondent, pursuant to assignment by his company, worked in England, France, Germany, Spain and Algeria. During this period, he had a tourist visa and a temporary permit. He always intended to return to his home in Sewickley Hills Borough and left a substantial amount of his personal property at his mother's house.

On February 10, 1968, respondent left the employ of the Chicago Bridge and Iron Company, married his

English fiancee and in March 1968 returned with his bride to his mother's house in Sewickley Hills Borough where he remained until about May 1, 1968. It is significant that before leaving England, respondent's wife, due to a health problem, was required by the United States Embassy in London to designate an official place of domicile in the United States and a physician who would treat her upon arrival in this country. She named Season Hill Farm as her domicile and Dr. Doyle as her physician. His clinic is in the Borough of Osborn adjacent to Sewickley and is also in the Twenty-eighth Legislative District. Respondent's wife continues to receive treatment from him at least every three months.

We think it is clear that up to this point respondent was domiciled in the district he seeks to represent. The objector's position to the contrary, which was advanced at the hearing, was not pressed in his briefs.

## THE VIRGINIA SOJOURN

On May 1, 1968, respondent, while living at his mother's house, obtained employment in connection with the candidacy of Congressman Richard S. Schweiker for the United States Senate from Pennsylvania. He became a member of the Congressman's campaign staff and his duties as a personal aide required him to accompany the candidate almost daily in touring the length and breadth of Pennsylvania until the latter's election to the United States Senate on November 5, 1968.

On January 3, 1969, respondent went on the payroll of the United States Government officially accredited to the staff of Senator Schweiker and remained so employed until the end of January 1970, when he moved back to Pennsylvania.

When respondent was first employed by the "Dick Schweiker for U. S. Senator Committee," an organi-

zation based in Norristown, Montgomery County, Pa., he expressed a desire to remain at his home in Allegheny County, Pa., and work from there but was told that the job required that he have living quarters in metropolitan Washington, D. C., so he would be in close touch at all times with Congressman Schweiker. Consequently, respondent and his wife rented an apartment for one year in Springfield, Va., about nine miles from Washington. During this period, respondent maintained at least two bank accounts in Sewickley Borough and his brokerage account in the Twenty-eighth Legislative District of Pennsylvania. He also retained his Pennsylvania motor vehicle operator's license and kept a few clothes, rather extensive hunting and sports equipment and various items of furniture in his mother's house. More important is the fact that respondent *voted* in the Twenty-eighth Legislative District of Pennsylvania in the general election of 1968 and also in 1969. He has never voted at any other place. See Messick v. Southern Pennsylvania Bus Co., 59 F. Supp. 799 (E. D. Pa., 1945), which holds that voting raises a rebuttable presumption that the voter is a citizen of the State in which he votes.

## WAS THE RESPONDENT DOMICILED IN VIRGINIA BETWEEN MAY 1, 1968 AND JANUARY 31, 1970?

The objector contends that Kelly was domiciled in Virginia and levels his heaviest attack on three facts involving his payment and nonpayment of taxes:

(1) Respondent paid a Virginia State income tax. In that return, he listed his address as Springfield, Va.

(2) Respondent listed his Virginia address in his 1968 Federal income tax return and, in making a

claim for a credit for moving certain personal property from England to Virginia, stated that he expected to live at his Virginia address for an indefinite time in the future.

(3) Respondent paid no wage, personal property or per capita tax in Pennsylvania.

In answer to the first point, Kelly testified he did not feel he was obliged to pay the Virginia income tax but finally accepted the advice of David Newhall, First Administrative Assistant to Senator Schweiker, that he do so. Mr. Newhall testified that it was his understanding that respondent was required to pay a Virginia income tax regardless of where he had his legal residence.

As to the *second* tax item, respondent testified he listed his Springfield, Va., address on his 1968 Federal income tax return because he wanted the refund he was claiming to be sent there. In his 1969 Federal income tax return, the Virginia address which had been typed therein was stricken out and respondent's present address at Ingomar, Allegheny County, was inserted in ink. This was done shortly after he moved his household furnishings from Virginia to Allegheny County on January 31, 1970.

As to the *third* charge, respondent testified he spoke to the tax collector and the borough solicitor of Sewickley Hills about his taxes and that he received no demand for payment. He said he did not know a wage tax or any other tax was owing.

Objector also contended respondent did not pay the Allegheny County four mills personal property tax on his securities. In regard to the three securities in dispute, the objector, a tax expert and respondent's witness, Evans Rose, Esq., also a tax expert, and one of his counsel, testified but failed to agree whether one of the securities was subject to tax. There was no proof offered as to the other two. When such recog-

nized experts differ, we fail to see why the unschooled layman should suffer.

## THE LAW

The law of domicile has been frequently stated. Comprehensive pronouncements appear, inter alia, in Dorrance's Estate, 309 Pa. 151 (1932); Obici Estate, 373 Pa. 567 (1953), and Loudenslager Will, 430 Pa. 33 (1968). In Obici Estate, the opinion was written by Mr. Justice Allen Stearne who stated page 571:

"In Hindman's Appeal, supra [85 Pa. 466], we said, p. 470, quoting from a Massachusetts case: '. . . "it depends not upon proving particular facts, but whether all the facts and circumstances taken together, tending to show that a man has his home or domicile in one place overbalance all the like proofs, tending to establish it in another." '

"In Dorrance's Estate, supra [309 Pa. 151], p. 170: 'In holding that a domicile of choice may not be retained by intention alone, we do not mean to disturb the well settled rule that absence from a place of legal residence, for purposes of health or other unavoidable necessity, will not result in a loss of that domicile. . . . Nor do we mean that where a man has two actual residences, either one of which might be his domicile, he is not free to choose between them. . .'

"We also said in Pusey's Estate, supra [321 Pa. 248], p. 265: 'It requires less evidence to prove the continuation of domicile than it does to establish a new domicile. Pusey's domicile of origin was Pittsburgh and it is an established principle that domicile, having been shown to exist, is presumed to continue until another domicile is affirmatively proven: . . . The court below concluded that appellants had not successfully carried the burden of proving a change in domicile.'

"An excellent statement concerning the quality and weight of evidence necessary to establish a change of domicile was made by the eminent Philadelphia Orphans' Court Judge, Clement B. Penrose, whose opinion is quoted at length in the official report of the Superior Court in Lowry's Estate, 6 Pa. Superior Ct. 143. It reads in part as follows (p. 148): 'A change of domicile works such important consequences, both as to the status of the person and the distribution of his personal estate, that the burden of proving a change is upon the party alleging it, and this is not only under settled principles of public law, but *under the fundamental rule of evidence that an established condition is presumed to continue. The presumption stands until overcome by proof and the proof must be clear and free from reasonable doubt.* Mere residence in a foreign country is not, standing by itself, enough. It must appear that the residence was *animo manendi,* and with the intention of abandoning the former domicil. An established domicil adheres until an intention to adopt, with an actual adoption of a new one is made manifest, . . .' (Emphasis by the Supreme Court.)

"Lowry's Estate, supra, related to domicile of origin; i.e., one acquired at birth. But there appears to be small difference in principle in the required proof of an effective change in domicile in the case of domicile of choice, especially one relating to a long established marital domicile. A heavy burden rests upon him who alleges a change in domicile to establish not only that decedent had acquired another domicile but that he *manifested and carried into execution an intention of abandoning his former domicile.* Such change must be 'animo et facto': Lowry's Estate, supra; Price v. Price, 156 Pa. 617, 27 A. 291. Where a 'domicile of choice' is once established, such domicile continues *until it is superseded by a new*

*domicile:* Restatement. Conflict of Laws, §23 . . ." (Emphasis by Supreme Court.)

In Loudenslager Will, 430 Pa. 33 (1968) Mr. Justice Benjamin R. Jones in speaking for our Supreme Court said, page 37:

". . . Under our case law, 'residence', in the statutory sense, is synonymous with 'domicile' (Obici Estate, 373 Pa. 567, 570, 571, 97 A. 2d 49 (1953)). 'The domicile of a person is the place where he has voluntarily fixed his habitation with a present intention to make it either his permanent home or his home for the indefinite future:' Publicker Estate, 385 Pa. 403, 405, 123 A. 2d 655 (1956). See also: Dorrance's Estate, 309 Pa. 151, 172, 163 A. 303 (1932). We further said in Publicker, supra: 'To effect a change of domicile there must be a concurrence of the following factors: (1) physical presence in the place where domicile is alleged to have been acquired and (2) an intention to make it his home without any fixed or certain purpose to return to his former place of abode: [citing an authority]': (Pages 405, 406).

"In determining a person's domicile, the language of the United States Supreme Court, almost a century ago in Mitchell v. United States, 21 Wallace 350, is most appropriate: 'A domicile once acquired is presumed to continue until it is shown to have been changed. Where a change of domicile is alleged the burden of proving it rests upon the person making the allegation, . . . Mere absence from a fixed home, however long continued, cannot work the change [of domicile]. There must be animus to change the prior domicile for another. Until the new one is acquired the old one remains. These principles are axiomatic in the law upon the subject.' (p. 353). See also: Price v. Price, 156 Pa. 617, 625-627, 27 A. 291 (1893); Dorrance's Estate, supra: Pusey's Estate,

321 Pa. 248, 265, 184 A. 844 (1936); Obici Estate, supra."

Applying these principles to the facts in the case before us, we feel the objector has been unable to meet the heavy burden which rests upon him to establish that Kelly "manifested and carried into execution an intention of abandoning his former domicile."

The objector cites the Lesker Case, 377 Pa. 411 (1954),[1] for the proposition that "In the law of domicile, intent is the actual state of facts, not what one declares them to be": (Page 416.)

In Lesker the court found that the candidate continued to live in his Pittsburgh apartment which he and his wife had occupied for years prior to the wife's death. The fact that the address of Lesker's son (which was not in the legislative district in question) appeared on the candidate's liquor license and motor vehicle registration card was held insufficient to overcome the presumption that he continued to live, as his maid testified, at his long-established domicile.

In Dorrance's Estate, supra, 309 Pa. 151, the Supreme Court held that decedent was domiciled in Pennsylvania where he actually lived with his family at a large and sumptuous Main Line estate at Radnor, Delaware County, Pa., in the suburbs of Philadelphia, despite the fact that he voted in New Jersey and entered into a written agreement with his wife that they would continue to vote and reside in that State. New Jersey gave greater tax benefits than Pennsylvania to her domiciliaries and their estates. This was found to be the motivating factor in Dorrance's repeated self-serving declarations that he was domiciled in New Jersey. Hence, one of the principal teachings of the Dorrance case is that the actual facts determine one's domicile rather than a mere expression of intent.

---

[1] Affirming this court's opinion in 66 Dauph. 133 (1954).

In Nixon v. Nixon, 329 Pa. 256 (1938), a strenuously contested divorce case, it was held that the fact that an Army officer in the performance of his duties spent much time out of the State did not preclude a finding of residence within the State and the presumption was that his original bona fide residence in Gettysburg, Pa., remained his domicile. The burden was upon the other spouse to prove a changed legal residence. It was further held that the purchase of a house in Washington, D. C., by the husband-appellant and the payment of a tax required by the laws of the District of Columbia of all persons maintaining "a place of abode" did not create a residence there, in view of the local statutes which recognized that such persons in the military service could have a "legal residence" elsewhere. The designation of residence in appellant's automobile license was held not to have any weighty significance for "[it] is not uncommon for persons temporarily in another state to have their cars licensed in that state."

Objector stresses the nonpayment of per capita taxes by respondent in the Twenty-eighth Legislative District. While this has some weight on the question of domicile, it is not controlling. See Roberts' Nomination Petition, 2 D. & C. 236, 25 Dauph. 379 (1922). There, the Dauphin County court, in an opinion prepared by President Judge Hargest, held that the candidate was domiciled in Findlay Township although he actually lived for two years in an apartment in the City of Pittsburgh for reasons of necessity and family convenience and paid an occupation tax in Pittsburgh but no such tax was assessed against him in Findlay Township.

In the case at bar, Kelly repeatedly testified that it was not his intention to make Virginia his domicile and that when he stated in his 1968 Federal income

tax return, "I expect to remain at my new residence for some time to come," he meant that he would be at that residence as long as he was working for Senator Schweiker. In any event, during the year 1969 he was clearly "absent on the business of the United States or of this State," as provided in article II, sec. 5, of the Pennsylvania Constitution. On January 3, 1969, Senator Schweiker was sworn in and Kelly became a member of his Senate staff on the Federal payroll and remained there until he severed that connection and came back to Pennsylvania on January 31, 1970, as heretofore stated.

In regard to his domicile from May 1, 1968, when, as heretofore stated, he began working as a member of the Schweiker for Senator campaign staff and so remained until the November election that year, we think he was still domiciled in the Twenth-eighth Legislative District, Allegheny County, Pa., and never intended to be domiciled in Virginia. His expressed desire to enter government work and run for public office evidently caused him to relinquish his job with the Chicago Bridge and Iron Company when he returned from Europe early in 1968. He then attended courses in government given by the Republican National Committee in St. Louis, Mo. This was followed by putting theory into practice almost every day in Pennsylvania during Senator Schweiker's campaign.

We do not believe that while gaining such practical and valuable experience in Pennsylvania politics respondent decided to cast it all aside and become a domiciliary of Virginia where he had no family roots or political connections whatsoever. Although counsel for objector strenuously argued that respondent "cut himself loose from his mother's apron strings" when he took his bride to live in metropolitan Washington,

794

D. C., and thus allegedly abandoned his Pennsylvania domicile, we cannot find that such a drastic step was contemplated or carried out by respondent. He vigorously *denied* over and over again in his testimony that he intended to establish a Virginia domicile, and we believe he was telling the truth.

The court should interpret the spirit as well as the letter of the law. In Fry's Election Case, 71 Pa. 302, the question arose as to whether students living in Allentown while attending Muhlenburg College in that city had the right to vote in Allentown. The Supreme Court in an opinion written by Justice Agnew held that their residence was merely temporary and that they were not entitled to vote in that city. At page 311, he stated:

"The rights of all men, the peace of society, and the good government of the state, require that the elector should vote at home, in his proper district where he is known, and among those *with whom he has cast his lot,* until yielding to circumstances, or to a desire of change, he has chosen voluntarily to abandon his former residence, and actually to gain a new one." (Italics supplied.)

A recent Dauphin County case which applies the same principle on domicile is Nomination Petition of Silverman, 89 Dauph. 59 (1968). There, this court, speaking through Judge Lipsitt, held that

"in view of all the testimony and using as a guideline the question where this candidate chose to 'cast his lot' and taking into consideration the burden of proof to be fulfilled by the objector, we are contrained to find that the domicile or legal residence of Louis Silverman is . . . as set forth in his nomination petition."

After full consideration, we feel that all the facts and circumstances taken together, tending to show that Mr. Kelly has had his domicile in the Twenty-

eighth Legislative District, Allegheny County, Pa., for a longer period than required by law, overbalance all the objector's evidence tending to establish domicile in Virginia.

For the foregoing reasons, we found that the objector failed to sustain his burden of proof and, therefore, dismissed his petition to set aside the nomination petition of the respondent-candidate, James B. Kelly, 3rd.

The prothonotary is directed to forward a copy of this opinion forthwith to the parties or their counsel.