473 A.2d 1069

**Miriam BELL, Appellant**

v.

**Henry M. BELL.**

Superior Court of Pennsylvania.

Argued Oct. 11, 1983.

Filed March 16, 1984.

238

Albert Momjian, Philadelphia, for appellant.

David W. Wood, Jr., West Chester, for appellee.

Before SPAETH, President Judge, and MONTEMURO and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from an Order of the Court of Common Pleas of Chester County sustaining appellee's, Henry M. Bell's, preliminary objections to appellant's, Miriam Bell's, Complaints in Equity and Declaratory Judgment. We affirm.

The court below denied appellant's request for the issuance of an injunction restraining the appellee from obtaining a divorce in Nevada. Therefore, the sole issue is

whether appellee has established such a domicile in Nevada having once lived in Pennsylvania.

In making that inquiry the material to be examined is the record presented, which consists of appellee's preliminary objections and answer, briefs of counsel, a deposition and interrogatories. *See Commonwealth ex rel. Esenwein v. Esenwein,* 348 Pa. 455, 35 A.2d 335 (1944), *cert. denied,* 321 U.S. 782, 64 S.Ct. 639, 88 L.Ed. 1075 (1944). We also note that since the lower court's Order regarding appellee's domicile is premised upon record evidence, i.e., no credibility determination or weight to be attached to a witness' testimony was required inasmuch as no witnesses testified before the trier of fact. Therefore, since the finding of fact (domicile) was simply a deduction from other facts and the ultimate fact in question is purely a result of reasoning, this Court may draw its own inferences and arrive at its own conclusions from the facts as established. *In re Estate of McKinley,* 461 Pa. 731, 734 n. 1, 337 A.2d 851, 853 n. 1 (1975).

The facts are somewhat unusual, and, as a result, will be recited at some length.

Henry and Miriam Bell were married in December of 1935 in Pennsylvania and lived in various locations throughout the Commonwealth until 1950. Thereafter, between 1950 and 1970, Henry Bell, while on assignment for Gulf Oil Corporation as its oil refinery advisor, lived with his family in Venezuela. During this 20-year hiatus, the Bells retained a mailing address and home in Media, Pennsylvania, until it was sold sometime in 1956 and another was purchased (farmhouse and acreage) in 1959 in Landenberg, Pennsylvania.

It was customary for the Bells to return to Pennsylvania about once a year, for a period ranging from one to two months, to vacation at their home in Media and, later on, in the Landenberg farmhouse. The Bells also acquired two homes in Florida. The first was purchased in 1969 "as a hedge against inflation" and was being rented. The second was ordered built by Mrs. Bell and was "where [they] went

when [Henry] took retirement in 1970" from Gulf. However, Henry did not stay retired for long. After two months of living in Florida, he asked for, and received, his former job with Gulf. This time, however, the assignment was in South Korea working for a Gulf subsidiary—Korean Oil Company. Mrs. Bell did not join her husband in Korea until 1972. From 1972 to 1975, the Bell family lived overseas and made periodic visits to the United States by coming to Pennsylvania.

In 1975, Mrs. Bell "returned to the U.S. with [her] daughter to live in the Pennsylvania farm. That was [her] purpose. [Since the original house, a barn and a number of acres were sold, the two] took an apartment the first year while [another] house was being built [on the remaining portion of the farm property.]" Mr. Bell retired from Gulf on July 1, 1975 and joined his family thereafter. All of his belongings were also shipped to the Landenberg address and transferred into the new residence upon completion. Nonetheless, as with his prior trip to Florida, Mr. Bell's respite was short-lived. Aside from a note found on his daughter's pillow, Mr. Bell exited the premises "around November 17, 1975," without a word to his family and went to his former job in Korea.

The next time Mrs. Bell saw her husband "was in April—spring vacation in 1977 .... He just came to the door." He remained for a month and discussed retiring to Pennsylvania in the Spring of 1978. When Mr. Bell returned in March of 1978, again on his vacation, he signed up for social security and gave his address as the farmhouse at P.O. Box 113, Landenberg, Pennsylvania. Thereafter, he left for Korea and returned in August of 1978 to retire.

Mr. Bell gave the appearance that he was serious this time. He moved into the Landenberg farmhouse, gave this address to Gulf, his bank (Provident National in Media) and the Pennsylvania Department of Transportation. However, when his attempt to secure a franchise from three fast-food chains proved unsuccessful, he came out of retirement after

some 10 weeks and went back to work for Gulf's Korean subsidiary.

After Mr. Bell's forced retirement from Gulf on June 1, 1980, he returned to Pennsylvania. This time he stayed in a motel during his discussions with his wife concerning their "getting a divorce." To prove the seriousness of his intentions, Mr. Bell retained counsel. Notwithstanding this tactic, Mrs. Bell refused to acquiesce to "an overall property settlement and ... an uncontested divorce." As characterized by counsel in his "Brief In Support of Defendant's Preliminary Objections Nunc Pro Tunc," "all efforts to settle the question were completely futile."

The Defendant explained to the Plaintiff his desire to divorce her under the Pennsylvania Divorce Code of 1980 and the Plaintiff replied that she would use every method in her power to prevent that from happening despite the fact that the marriage was obviously on the rocks.

Because the Plaintiff threatened to use the Defendant's return to Chester County for a three (3) week period during October of 1978 during which time he resided in the same home, albeit not in the same bedroom, with the Plaintiff to hold up the No-Fault Divorce if filed under Section 201(d) of the Divorce Code of 1980, and further because the Plaintiff refused to give her consent to the Divorce Action filed under Section 201(c), the Defendant decided to take up residency in the State of Nevada.

As counsel phrased it, Mr. Bell, "[i]n complete frustration, ... moved to Nevada from the motel room in Chester County and resided in the State of Nevada for the requisite time, during which time he secured counsel in Nevada and filed suit under the laws of that State to terminate his marriage to Miriam Bell." In particular, Mr. Bell commenced divorce proceedings "at No. 80–8140 in the Second Judicial District Court of the State of Nevada, in and for the County of Washoe, seeking a dissolution of his marriage to Plaintiff alleging, *inter alia,* that he ha[d] resided in the State of Nevada for the requisite period of time, and,

therefore, [was] entitled to a 'no-fault divorce'." (*See* Appellant's "Complaint in Divorce," Point 7)

At this stage of the discussion it is appropriate to remark that we have, intertwined into this scenario, documentation in the form of two letters written by Mr. Bell to his wife, copies of which were produced at Mrs. Bell's deposition and attached to a transcription thereof, casting some light on the husband's intention regarding his sojourn to Nevada.

Mrs. Bell found the first letter on her kitchen table at the Landenberg home on August 3, 1980—the date the husband left for Reno, Nevada. It reads:

Miriam.

Enclosed is a check for 780 dollars which is 60% of the money you have spent for U. of Delaware costs.

We are not getting anywhere on the division of property so I think I will go out West and maybe I will have a better chance for the job in Nigeria.

If you want to get another appraisal of this property for comparision [sic] I think it would be a good idea. *In any event when you are ready to move out I will move in.* Staying in the other house is a little to [sic] rough for me. Also, I don't want to rent an apartment because I would have to sign a long lease.

I will stay in touch either by phone or letter. (Emphasis added)

The second letter was dated September 1, 1980 (just eight days prior to Mrs. Bell receiving the Nevada complaint in divorce from her husband) and was post-marked from Truckee, California. It provided in relevant part:

Sept. 1, 1980

Dear Miriam

\*    \*    \*    \*    \*    \*

I have been given the job in Nigeria. Out of 36 people I was selected for the top job which is General manager of the Nigerian pipeline system. I have received all of my shots and taken a medical examination. As soon as the visa to Nigeria is granted I will be required to go.

The only aspect of working in Nigeria is that it is a malaria and yellow fever zone. The yellow fever is no problem because the injections make a person immune. The malaria is a different problem and there is no injection to cause immunity.

If and when you move out of the farm house I will have a real estate man try to rent it. I feel that real estate is once again going up and the value of the dollar coming down, so in my opinion a poor time to sell. *If I go to Nigeria I will want a house when I come back.*

I deposited money for you and Kimie on August 28.

Henry.

(Emphasis added)

There is no evidence to indicate, nor does Mr. Bell assert otherwise, that Mrs. Bell entered an appearance or filed an answer to the Nevada complaint in divorce. Instead, Mrs. Bell filed a Complaint in Equity in the Court of Common Pleas of Chester County on December 23, 1980. Therein, she alleged in relevant part:

6. As a result of the breakdown in negotiations, Defendant is now asserting, in fraud of this court and in an effort to avoid the laws of Pennsylvania, a residence in the State of Nevada.

7. . . .

8. Plaintiff is without funds to pursue the Defendant and to establish the foregoing facts in the courts of the State of Nevada and, thus, will suffer irreparable harm and injury if the Defendant is permitted to proceed with the aforedescribed fraudulent course of conduct[—i.e., securement of a divorce].

9. Plaintiff has no remedy at law.

10. Immediate and irreparable injury will be sustained before notice can be given or a hearing held on this matter.

WHEREFORE, Plaintiff prays this Honorable Court to issue:

A. An ex parte injunction restraining the Defendant, his agents, servants and employees, from commencing or proceeding with any action in the State of Nevada or in any other location other than the Commonwealth of Pennsylvania which would be aimed at obtaining a divorce from the bonds of matrimony until a hearing can be held on this matter;

B. An order that a hearing need not be held within five (5) days after the granting of this ex parte injunction, but may be held after service has been perfected on Defendant;

C. Subsequent to a hearing on this matter, a permanent injunction restraining the Defendant, his agents, servants and employees from commencing or proceeding with any action in the State of Nevada or in any other location other than the Commonwealth of Pennsylvania which would be aimed at obtaining a divorce from the bonds of matrimony.

The Chester court issued a rule returnable on January 23, 1981 (notice of which was given to counsel who represented Mr. Bell in the initial, unsuccessful effort to resolve the marital controversy amicably). On the date stated, the merits of issuing a preliminary injunction were argued, and, thereafter, an Order was entered enjoining and restraining Mr. Bell "from commencing or proceeding with any action in the State of Nevada or in any other location other than the Commonwealth of Pennsylvania which would be aimed at obtaining a divorce from the bonds of matrimony until such time as a hearing can be held on the matter." (Record No. 4)

The injunction was issued despite counsel for Mr. Bell asserting that the Chester court had "no personal jurisdiction over the Defendant, Henry M. Bell, for th[e] reason that his domicile is now, and at all times relevant to the within matter has been Reno, Nevada." (Appellee's "Preliminary Objections," Point 1)

Of relevance here is the fact that there is no evidence of record to indicate that the Nevada action continued in the

face of the preliminary injunction. Although in response to the interrogatory requesting, "The date and place and manner of termination of each marriage," Mr. Bell answered, "Reno, Nevada, February 13, 1980," later on during the same session he stated that the date he first arrived in Reno was "August 6, 1980."[1] This last date is consistent with the other documents produced in the record recounting the facts leading up to the instant appeal. Thus, since we have no Order indicating that Mr. Bell's divorce was granted of record, it is appropriate to conclude that his Nevada divorce is still pending. Accordingly, we are not confronted with a full faith and credit question regarding a sister state's divorce decree, which, once granted, is presumptively valid in this jurisdiction. *See Esenwein v. Pennsylvania*, 325 U.S. 279, 65 S.Ct. 1118, 89 L.Ed. 1608 (1945); *Williams v. North Carolina*, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945); *Watson v. Watson*, 243 Pa.Super. 23, 364 A.2d 431 (1976). Rather, we must decide if the Chester court's ruling, sustaining appellee's preliminary objections, that it "lack[ed] *in personam* jurisdiction over [Mr. Bell] because his domicile is not in the Commonwealth of Pennsylvania[,]" (Trial Court Opinion at 1), is supported by the evidence (*see Lox, Stock and Bagels, Inc. v. Kotten Machine Co. of California, Inc.*, 261 Pa.Super. 84, 395 A.2d 954 (1978)) so as to permit the appellee-husband the opportunity to proceed, unhindered, to have his Nevada complaint in divorce completed. The burden is on the husband to prove that he has a right to do so.

In *Smith v. Smith*, 364 Pa. 1, 4, 70 A.2d 630, 632 (1950), a case procedurally similar to the one at bar, our Supreme Court stated:

1. Purely as a matter of interest, we make mention that the interrogatories for both sides were asked by the Vice Consul of the United States at Lagos, Nigeria on October 29, 1981, pursuant to a "Commission" issued by the Chester court ordering the Vice Consul "to examine the said witness [Mr. Bell] upon his oath or solemn affirmation, touching the premises, and reducing his testimony to writing." (Record No. 17)

It seems that Mr. Bell secured employment in Nigeria on September 25, 1980, from a Tulsa, Oklahoma oil company (Wills Bros. Energy Service Co.) based overseas, during his residency in Reno, Nevada.

Under *Williams v. North Carolina (No. 1)*, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273, a divorce granted by a court of the bona fide domicile of either spouse is valid and must be given full faith and credit. The only ground upon which a divorce decree of another jurisdiction may be attacked is that it was not the bona fide domicile of either spouse. *Williams v. North Carolina*, 325, U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366; *Commonwealth ex rel. Esenwein v. Esenwein*, 348 Pa. 455, 35 A.2d 335. Since equity has no power to restrain a person from obtaining a lawful divorce, it follows that an injunction may only be granted where the spouse has not established a bona fide domicile in the state in which the divorce is sought. Thus the sole issue here is whether defendant has established such a domicile in Florida.

Instantly, as in *Smith*, the only issue we need to decide is if Mr. Bell has established a domicile in Nevada by "clear and satisfactory proof." *See In re Estate of McKinley, supra.*

From the evidence presented to this Court, it cannot be questioned that Mr. Bell was for some years a Pennsylvania domiciliary. That domicile having been shown to exist, it is presumed to continue until another domicile is affirmatively proven. *Smith v. Smith, supra.*

It must be recognized that some confusion has arisen, and still persists, in the lay mind as to what constitutes domicile, for it is often used synonymously with residence. On this discrepancy, our Supreme Court has spoken:

Not only are *residence* and *domicile* employed synonymously and interchangeably but often they are used overlappingly with one word including, with its meaning, a part of the meaning of the other. Thus, the person with a country home and a city home may with grammatic correctness say that he resides at both places. In point of law, however, only one of these places can be his permanent legal residence, that is, his domicile. Because he may (everything else being equal) arbitrarily decide which of these two places he will adopt as his domicile, it is said that residence is a matter of intent. And it is

because of this loose generalization (that intention makes residence) that .... [cause people to] confuse[ ] intent with declaration of intent.  In the law of domicile, intent is the *actual* state of facts, not what one declares them to be.  One may even believe he is expressing intent and yet this expression would not be enough to establish the domicile or permanent abode which makes up legal residence in the law.

\*      \*      \*      \*      \*      \*

It seems impossible to restrict the terms habitation, residence and domicile to airtight, waterproof compartments.  Their meanings seem bound to escape their lexicographical boundaries and mingle with the others since a person's place of *residence* may be identical with his *domicile,* and *habitation* is always a component part of *residence* and *domicile.*  However, in strict technical terminology a *habitation* may be defined as an abode for the moment, *residence* a tarrying place for some specific purpose of business or pleasure, and *domicile* the fixed, permanent, final home to which one always intends to return.  A person's civil status is determined by his domicile.  Thus a business man may have his family home in the suburbs of a city where he lives with his wife and children.  No matter where he travels nor how long he remains away, he always returns to this abode.  This is his domicile.  For business reasons he may have a residence in the city, even living there for many months of the year.  This residence can never become the basis for voting or for candidacy for office.  If travelling, he may stay at a hotel, boarding or rooming house.  This would be his habitation and, regardless of expression of intention, could never become his legal domicile.

\*      \*      \*      \*      \*      \*

To accomplish a change of domicile there must be not only the *animus* to change but the *factum* as well.  There must be an actual transfer of bodily presence from one place to the other.  The *animus* and the *factum* do not need to be simultaneous, but until they coincide the change of domicile is not effected.  In the law a domicile

is as deep rooted as a tree and to transfer it from one location to another requires an operation as intensive as the digging up, loading, transportation, and replanting of an elm or maple.

One almost conclusive criterion of domicile is the *animus manendi*. There must be the intention to *remain*. (Emphasis in original)

*In re Lesker*, 377 Pa. 411, 416–419, 105 A.2d 376, 378–379 (1954). Moreover, the term domicile has been defined as:

... the place in which, both in fact and intent, the home of a person is established without any purpose to return to a former home; the place where he lives, in distinction from that where he transacts his business; the place where he chooses to abide, in distinction from that in which he may be for a temporary purpose ....

*Wallace v. Wallace*, 371 Pa. 404, 410, 411, 89 A.2d 769, 771 (1952). As a result of the criteria just cited, it is not surprising to find "that a person's domicile is increasingly being determined by close scrutiny of his subjective intentions or state of mind as to whether or not he considers a particular place to be his home." *McKenna v. McKenna*, 282 Pa.Super. 45, 50, 422 A.2d 668, 670 (1980). This translates into the following:

*Intent, being purely subjective, must to a large extent be determined by the acts which are manifestations of that intent.* However, it does not follow from that that the acts must all occur simultaneously with the formation of the intent. Such a conclusion would be contrary to human nature. One does not move to a new domicile and immediately change church membership, bank account, operator's license, and club memberships. Nor does he immediately select a neighborhood, purchase a home and buy furniture. All of those acts require varying degrees of consideration and as a consequence cannot be done hastily nor simultaneously. (Emphasis added)

*Wallace v. Wallace, supra*, 371 Pa. at 409, 89 A.2d at 771.

Here, Mr. Bell acknowledges that he had a dual purpose in traveling to the West. The first was to obtain a divorce

which his wife had prevented him from securing in Pennsylvania. Second, he felt that his chances for obtaining the oil job in Nigeria, with an Oklahoma based company, would be enhanced if he appeared for the interview in person. The job was secured ultimately during appellee's stay in Nevada between August 6 and September 25, 1980. Thereafter, he took up residence in Lagos, Nigeria and became operations manager of the Oklahoma company's pipeline for a period of two years.

The fact that Mr. Bell's motive for going to Nevada may have been to obtain a divorce is relevant only to the extent that it helps clarify his intention regarding his stay in Nevada. His motive for going to Nevada is immaterial if, in fact, he intended to stay there indefinitely. *See, e.g., Commonwealth ex rel. McVay v. McVay*, 383 Pa. 70, 118 A.2d 144 (1955); *Commonwealth ex rel. Lorusso v. Lorusso*, 189 Pa.Super. 403, 150 A.2d 370 (1959).

Because "[i]ntention is a thought known only to the person who has it[, w]ith our limited ability to extract the thoughts of another against his will, we must rely upon what he says his thoughts are and what his acts indicate his thoughts to be." *Commonwealth ex rel. Lorusso v. Lorusso, supra*, 189 Pa.Super. at 410, 150 A.2d at 374. In accordance therewith, we reproduce the oath-given responses of the appellee-husband to the interrogatories posed by the Vice Consul of the United States of America during his stay in Nigeria. For example:

50. Have you within the past two (2) years changed your residence?

To the fiftieth interrogatory, he says: Yes.

51. If so, state:

a. The date of the change

b. The address or addresses at which you resided after your change of residence

c. The purpose or purposes for your change of residence

d. The length of time at which you resided at the address as set forth in (b) above

e. Your intentions whether or not to continue to reside at such addresses or residences upon your return to the United States

To the fifty-first interrogatory, he says: The date of the first change was when I retired from Gulf Oil in June 1980. I went on vacation and also looking for employment. Stayed in motels first in Pennsylvania then in Florida and then back in Pennsylvania once again and then on August 6 went on to establish a residence in Nevada at 1690 Merchant Street, Sparks, Nevada and on September 26 moved to Nigeria establishing a residence in Lagos, Nigeria. Address Williams International Nigeria, Ltd., Post Office Box 1057, Lagos, Nigeria. The length of time at which you resided [at] the addresses set forth in b above. I stayed in Pennsylvania in motels for 53 days during 1980. I stayed in motels in Florida for 21 days in 1980 and *I spent 50 days in Sparks, Nevada in 1980 returning again in 1981 and spent an additional 21 days in Sparks, Nevada. Same address. I intend to when my contract is finished in Nigeria to return and live in Nevada.*

52. Are there any facts, not already inquired into, upon which you will rely to prove that you are a resident and domiciled within the State of Nevada or any other state?

To the fifty-second interrogatory, he says: Yes, there are other facts.

53. If so, for each such fact, state what the fact consists of and indicate how you contend that fact tends to establish your residence or domicile.

To the fifty-third interrogatory, he says: I have established a bank account because it establishes a business base. Also I have my car stored there for use when I return to Nevada and I use the car yearly 51 days. Also rent an apartment at the same address 1690 Merchant Street and also have a car. My car is registered in the state of Nevada. I carry Nevada insurance. Next I prefer the climate which is dry and it's beneficial to my health. (Emphasis added)

Also, in the course of responding to the interrogatory numbered 49, which asked if he "ever made any declarations relative to [his] residence or domicile[,]" Mr. Bell stated, "Yes." "The identity of the document was application for employment. The date of the declaration was August 20, 1980. Description of the declaration was to— application for employment. Address at that time was 1690 Merchant Street, Sparks, Nevada."

As we can readily see from the record cited above, during the short time that Mr. Bell lived in Nevada, he managed to rent, *and continues to rent,* an apartment at 1690 Merchant Street, Sparks, Nevada. In fact, he "return[ed] again in 1981 and spent . . . 21 days in Sparks, Nevada. Same address." This occurred while he was still employed by the Oklahoma oil company in Nigeria. Additionally, Mr. Bell opened a checking account at the Valley Bank of Nevada, he changed the registration on his 1980 Oldsmobile from Pennsylvania to Nevada in September of 1981, secured Nevada automobile insurance and stored the vehicle in Nevada until his return.

While the principles of law hereinabove set forth are well established, their application to factual circumstances and conditions, as is exemplified by the unusual facts at bar, is often difficult. Nonetheless, we believe that Mr. Bell has established the severance of his domiciliary attachments to Pennsylvania and is a Nevadan for purposes, if he so desires, of seeking a divorce from the bonds of matrimony in that jurisdiction. In other words, he has satisfied his burden of proving by "clear and satisfactory" evidence that he has effectuated a change of domicile to a new locality (Nevada) and the intention of making that his *permanent* home, albeit it will not be implemented until he completes his contractual obligations overseas. *See generally Wallace v. Wallace, supra; McKenna v. McKenna, supra.* Such an absence from one's domicile because of employment is not sufficient to defeat the establishment of a "true, fixed, permanent home and principal establishment. *In re Dorrance's Estate,* 309 Pa. 151, 163 A. 303 (1932). After a domicile is acquired, continuance is presumed."

*McKenna v. McKenna, supra,* 282 Pa.Super. at 48, 422 A.2d at 669.

██ The wife-appellant points to the letters written by her husband, his retention of a bank account in Media, Pennsylvania, at the Providence National Bank and the presence of a crate of his clothing at the Landenberg home as indicia establishing the continuation of Pennsylvania as Mr. Bell's domicile. We disagree.

We note that the Media bank account is jointly owned and has been "frozen" by court order pursuant to Mrs. Bell's institution of her own complaint in divorce "in the Court of Common Pleas, Chester County, Pennsylvania, at No. 287, December Term, 1980." As for the relevancy of the clothing left behind at the Pennsylvania location by Mr. Bell after his departure, we, as did the trial court, find this element to be "of little moment. That [Mr. Bell] has done without them for so long shows that they are not of particular importance to him." (Trial Court's Opinion at 3) Lastly, we find that the letters having been written prior in time to the acts *(see supra)* which we believe manifest an intention (coupled with physical presence) on the part of Mr. Bell to establish the legitimacy of his domicile in Nevada, the Order of the court below will be sustained.

Order affirmed.[2]

SPAETH, President Judge, files a dissenting opinion.

SPAETH, President Judge, dissenting:

The issue here is personal jurisdiction. Although the cases are not easily harmonized, *cf. Crompton v. Park*

---

2. We note that even if Mr. Bell brings an *ex parte* divorce action in Nevada, his wife is not foreclosed from seeking alimony, child support and equitable distribution of marital property under Pennsylvania's New Divorce Code of 1980. *See* 23 P.S. § 101 *et seq.; Stambaugh v. Stambaugh,* 458 Pa. 147, 329 A.2d 483 (1974); *Sohmer v. Sohmer,* 318 Pa.Super. 500, 465 A.2d 665 (1983), petition for allowance of appeal denied January 20, 1984 [No. 608 E.D. Allocatur Docket 1983].

Also, we wish to acknowledge our agreement with the trial court that those arguments raised by the appellant for the first time in her concise statement of matters complained of on appeal are waived. *See Benson v. Penn Central Transportation Co.,* 463 Pa. 37, 41, 342

*Ward Motors, Inc.,* 299 Pa.Super. 40, 445 A.2d 137 (1982) (burden on plaintiff); *Whalen v. Walt Disney World Company,* 274 Pa.Super. 246, 418 A.2d 389 (1980) (same) *with Gulentz v. Fosdick,* 320 Pa.Super. 38, 466 A.2d 1049 (1983) (burden on moving party); *Holt Hauling & Warehousing Systems, Inc. v. Aronow Roofing Company,* 309 Pa.Super. 158, 454 A.2d 1131 (1983) (same), the better view is that once an objection to personal jurisdiction is properly raised, the plaintiff (appellant) bears the burden of proof. In my view, appellant met her burden by establishing that her husband (appellee) had been a Pennsylvania domiciliary until August 1980. Since it is presumed that he continued to be a Pennsylvania domiciliary, *In re Estate of McKinley,* 461 Pa. 731, 337 A.2d 851 (1975), it was his burden to prove that he became domiciled elsewhere. I am satisfied that he did not meet that burden. I believe that all appellee intended to do in Nevada was to get a divorce. I am quite unpersuaded that he intends, or ever intended, to make his home there. Nothing about his past life justifies such a finding.

The order of the trial court should be reversed.

A.2d 393, 395 (1975); *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974).