## In re Nominating Petition of Weinberg

*E. Graham Robb,* for petitioner.
*Richard Sprague,* for respondent.

HERRON, *J.,* March 25, 1999—

## INTRODUCTION

In objecting to the nomination petition of Marty Weinberg for mayor of Philadelphia, petitioner, Happy Fernandez, challenges whether he has satisfied the three-year residency requirement for mayor. In essence, she alleges that he abandoned his Philadelphia domicile—albeit perhaps for only a period of months—in favor of a home in Bala Cynwyd that was purchased in December 1997 and then inhabited by candidate Weinberg's stepson and daughter-in-law in April 1998 until it was sold in October 1998. Following an evidentiary hearing, this court found the evidence presented by petitioner insufficient as a matter of law to satisfy the heavy burden of proof required to prove that a change in domicile occurred.

## PROCEDURAL BACKGROUND

Petitioner, Happy Fernandez, filed a petition seeking to set aside the nomination petition of Marty Weinberg for mayor of the City of Philadelphia pursuant to 25 P.S. §2937. Petitioner sets forth two grounds for setting aside Mr. Weinberg's petition. First, she asserts that his accompanying affidavit is defective and false be-

cause he has not been a resident of Philadelphia for at least three years preceding his election, thereby failing to satisfy the eligibility requirements for mayor set forth in the Philadelphia Home Rule Charter.[1] Second, Ms. Fernandez asserts, the affidavit is defective because Mr. Weinberg failed to sign it.[2]

Section 977 of the Pennsylvania Election Code, which has been invoked by the petitioner, establishes that objections may be raised to nomination petitions and papers by petition "specifically setting forth the objections thereto." 25 P.S. §2937. A court is then required to schedule a hearing to determine whether the papers are defective under the provisions of section 966 or for the reasons set forth in section 977:

"If the court shall find that said nomination petition or paper is defective *under the provisions of section 976,* or does not contain a sufficient number of genuine signatures of electors entitled to sign the same under the provisions of this Act, or was not filed by persons entitled to file the same, it shall be set aside." 25 P.S. §2937. (emphasis added)

---

1. At the outset of the hearing, Mr. Weinberg's counsel moved to dismiss the petition for lack of specificity and this court, after argument, reserved ruling on that motion. N.T. (3/23/99) at 7-20 ("N.T." or "2 N.T. " to indicate the second, shorter transcript prepared).

This court finds that the averments in the petition were sufficiently specific and adequate to set forth a prima facie challenge, although the evidence presented ultimately failed to meet the high burden of proof applicable in this case.

2. Petition objecting to the nomination petition of Marty Weinberg (objecting petition), ¶¶4-7. During the hearing on March 23, 1999, Mr. Weinberg made a motion asking leave to amend his candidate's affidavit so that he could sign it. The objectors did not oppose this motion and it was granted. N.T. at 6.

Section 976, which is thus incorporated as a basis for filing objections to nomination petitions, specifically refers to defective affidavits since it provides, inter alia, that:

"No nomination petition, nomination paper or nomination certificate shall be permitted to be filed if (a) *it contains material errors or defects apparent on the face thereof, or on the face of the appended or accompanying affidavits . . . .*" 25 P.S. §2936. (emphasis added)

Similarly, the Election Code requires candidates to file affidavits along with their nominating petitions. 25 P.S. §2870. The code also outlines the information that the candidate must supply: "(a) his *residence,* with street and number, if any, and his post-office address; (b) his election district, giving city, borough, town, or township; (c) the name of the office for which he consents to be a candidate; (d) *that he is eligible for such office;* . . . ." 25 P.S. §2870. (emphasis added)

Consequently, under these and other statutory provisions, this court has jurisdiction to consider whether a nomination petition should be set aside because of a defective or false affidavit relating to a candidate's legal residency. *In re Nomination Petition of Pippy,* 711 A.2d 1048, 1055 (Pa. Commw. 1998), *aff'd,* 551 Pa. 210, 709 A.2d 905 (1998).[3]

---

3. This somewhat extended analysis of the jurisdictional basis for reviewing a nomination petition was prompted by amendments to the Election Code by Act 18 of 1998 that are extensively discussed by the Commonwealth Court in *In re Nomination Petition of Pippy, supra,* 711 A.2d at 1054-55. In addition to the sections cited above, the Commonwealth Court concluded that courts have the authority to review defective affidavits based on 25 P.S. §3502.1 which provides that any candidate for state or city office "who knowingly makes

RESIDENCY ANALYSIS

In analyzing the objections based on residency that have been raised against Mr. Weinberg's petition, certain underlying principles necessarily apply. Nominating petitions, for instance, are presumed to be valid and objectors have the heavy burden of proving invalidity. *In re Nomination Petition of Pippy,* 711 A.2d at 1057. Courts have emphasized, moreover, that "the provisions of the Election Code must be liberally construed so as not to deprive an individual of his right to run for office or the voters of their right to elect the candidate of their choice." *In re Nomination Petition of Pippy,* 711 A.2d at 1050.

The Philadelphia Home Rule Charter requires that the mayor "shall have been a resident of the city for at least three years preceding his election." Philadelphia Home Rule Charter §3.3-300, 351 Pa. Code §3.3-300. The stated purpose for this provision is that "a minimum residence of three years is required so that the mayor will have some intimate knowledge and understanding of the city's problems and needs." *Id.*

Although there does not seem to be any appellate precedent focusing on the charter's mayoralty residency requirements, precedent dealing with residency requirements in other elections is instructive as are cases dealing with residency requirements for city employees.[4] The

a false statement regarding his eligibility or qualifications for such office in his candidate's affidavit shall, in litigation which results in the removal of the candidate from the ballot, be liable for court costs, including filing fees, attorney fees, investigation fees and similar costs, in an amount up to $10,000."

4. The Philadelphia Code sets forth residence requirements for civil service employees of the city:

"(1) No person shall be appointed as an employee in the civil service of the city unless he has been a bona fide resident of the city for at least one year prior to his appointment.

election cases clearly establish that the burden of proving insufficient residency is on the objector. The objector thus has the burden of proving that an affidavit is false in its statements about the candidate's residency. This is a heavy burden since the objector must prove that the candidate is not a resident of the disputed address; the candidate does not have to prove that he is. This requires a showing by the preponderance of the evidence. *In re Nomination Petition of Cooper,* 163 Pa. Commw. 430, 436-37, 643 A.2d 717, 720-21 (1994). See also, *In re Nomination Petition of Street,* 102 Pa. Commw. 155, 163-64, 516 A.2d 791, 795 (1986) (the burden of proof on an objector raising a residency challenge "is indeed heavy," because a "domicile, once established, is presumed to continue until it is shown that it has been changed").

It is also well established that it is possible to have many residences "but only one 'legal residence' or 'domicile.' " *Rodgers v. Commonwealth, Unemployment Compensation Board of Review,* 40 Pa. Commw. 552, 554, 397 A.2d 1286, 1287 (1979); *McCarthy v. Philadelphia Civil Service Commission,* 19 Pa. Commw. 383, 387, 339 A.2d 634, 636 (1975), *aff'd,* 424 U.S. 645 (1976). The terms permanent legal "resident," "inhabitant" and "domicile" have been frequently analyzed in cases involving candidates for the Pennsylvania General Assembly where courts necessarily focus on whether candidates have satisfied the electoral residency requirements. See *In re Nomination Petition of Prendergast,* 543 Pa. 498, 505-506, 673 A.2d 324, 327-28 (1996); *In re Nomination of Cooper,* 163 Pa. Commw. 430, 643 A.2d 717 (1994). In these cases, the terms

---

"(2) Every employee in the civil service shall maintain his bona fide residence in the city." Pa. Code §20-101.

"inhabitant" or "resident" does not " 'mean one sojourning temporarily, or for some special purpose, but refers to one who has a permanent abode; the domicil [sic] of the senator, representative, governor or judge. . . .' " *In re Nomination Petition of Prendergast, supra,* 543 Pa. at 505-506, 673 A.2d at 327. See also, *Lesker Case,* 377 Pa. 411, 415, 105 A.2d 376, 379 (1954) (quoting *Fry's Election Case,* 71 Pa. 302, 307). In defining residency or domicile for these electoral purposes, the *Prendergast* court emphasized the need to analyze the complex intermingling of intent[5] and physical presence that are essential elements of domicile:

"A domicile is the place at which an individual has fixed his family home and principal establishment for an indefinite period of time. . . . A domicile once acquired is presumed to continue until it is shown to have been changed and where a change is alleged, the burden of proving it rests upon whoever makes the allegation. . . . A new domicile can be acquired only by physical presence at a new residence plus intent to make that new residence the principal home. . . . Intent is the actual state of facts, not what one declares them to be. An established domicile, however, can be retained without physical presence or residence until it is proven that a new domicile has been acquired." *In re Prendergast, supra,* 543 Pa. at 506, 673 A.2d at 327-28 (quoting *Dorrance's Estate,* 309 Pa. 151, 163 A. 303 (1932)).[6]

---

5. As the Supreme Court observed in *Lesker, supra,* it is important not to confuse "intent with a declaration of intent. In the law of domicile, intent is the *actual* state of facts, not what one declares them to be." *Lesker, supra,* 377 Pa. at 416, 105 A.2d at 379.

6. The "rules for determining residence" set forth in the Election Code, 25 P.S. §2814, have also been invoked in determining whether

Thus, while determination of a person's domicile or permanent residence is a question of law, it inevitably depends on the facts of a particular case. *Civil Service Commission of Pittsburgh v. Parks,* 80 Pa. Commw. 134, 136, 471 A.2d 154, 156 (1984); *Goetz v. Borough of Zelienople,* 14 Pa. Commw. 639, 644, 324 A.2d 808, 811 (1974).

In attempting to satisfy her burden of proof, the objector presented the testimony of just one witness, the candidate Marty Weinberg, and various documents. The period at issue, the parties stipulated, was the three-year period following November 2, 1996[7] preceding the 1999 mayoralty election. Throughout his testimony as on cross-examination and on direct, Mr. Weinberg consistently maintained that he had maintained his legal residence during this three-year period in Philadelphia: first in a home in Society Hill at 267 St. Joseph's Way and then at a condominium he purchased on the Delaware River at Pier 5. Both of these homes were purchased by Mr. and/or Mrs. Weinberg. He testified that they purchased the townhouse on St. Joseph's Way on April 22, 1996 and sold it on May 1, 1998 and that he resided there from April 1996 through March 1998.[8]

a candidate has satisfied the residency requirements for elective office. See *e.g., In re Nomination of Prendergast, supra,* 543 Pa. at 506, 673 A.2d at 328 (referencing 25 P.S. §2814(h)); *In re Nomination of Cooper,* 163 Pa. Commw. 430, 442 n.11, 643 A.2d 717, 723 n.11 (1994) ("While technically section 704 of the code [25 P.S. §2814] is used to determine the residence of a 'person desiring to register [to] vote,' there is no reason not to apply it to determine residency election qualifications."); *In re Nomination Petition of Carabello,* 102 Pa. Commw. 129, 516 A.2d 784 (1984) (referencing 25 P.S. §2814(d)).

7. N.T. at 24.

8. N.T. at 69-74. Mr. Weinberg testified that May 1, 1998 was the settlement date for the St. Joseph's Way property. N.T. at 74.

On April 30, 1998, Mrs. Weinberg purchased the condominium at Pier 5 from her son.[9] Mr. Weinberg stated that he moved into this condominium in late March 1998, and continues to reside there until renovations are completed on a house he purchased on Delancey Street in the Rittenhouse Square neighborhood of Philadelphia.[10] This testimony, thus, established a steady chain of property ownership and residence in Philadelphia by Mr. Weinberg throughout the three-year period preceding the 1999 mayoralty election.

The petitioner contended, however, that Mr. Weinberg had not been a resident of the city for the entire three years prior to the election.[11] During the evidentiary hearing that was held on her objections, her counsel focused his questions on the Weinbergs' purchase of a house at 34 Sandringham Road, in Bala Cynwyd or Penn Valley[12] on December 4, 1997.[13] Mr. Weinberg, in unrebutted testimony, stated that he purchased this property as an investment:

"I thought it was a great investment and I thought I would make a lot of money. I was surprised how cheap I could get it.

"Q: Were you buying this as an investment property, sir?

"A: Yes. . . .

---

9. N.T. at 73-74, 87.

10. N.T. at 26, 75-76.

11. N.T. at 18 (petitioner's counsel explaining the basis for her petition in response to motion to quash for lack of specific objection).

12. Mr. Weinberg noted that the property was either in Penn Valley or Bala Cynwyd depending on the post office, but his counsel stipulated that it was outside of Philadelphia. N.T. at 38.

13. See *e.g.,* N.T. at 32, 85-86.

"Q: Did you also buy it, sir, as a country house to visit on the weekends and spend perhaps the summer months at?

"A: What I have done, Mr. Robb, on many occasions is to where a property that I feel is a good investment, purchase it, fix it up and use it while it's for sale. That's what I intended in this particular case to do. And it did happen to be in what I described as country. And I intended to while it was for sale after I put it up, use it on weekends and hoped to make a very good profit." N.T. at 33.

This kind of purchase was not unusual for the Weinbergs, he stated, because they had purchased houses to renovate for investments "perhaps 15 times in the last 20 years." N.T. at 86.

After purchasing the Bala Cynwyd property, Mr. Weinberg testified that "sometime in December" of 1997 his wife spent "quite a bit of time" at the property overseeing work on the renovations. This lasted for "a few months period." [14] This pattern of spending a great deal of time supervising renovations—and even staying overnight—was not uncommon for Mrs. Weinberg: "That's what she normally did when we bought a house." [15]

During this time, Mr. Weinberg testified:

"I was splitting my time between St. Joseph's Way and Bala Cynwyd and, of course, we were also at the same time looking around because we wanted to buy our residence. We wanted our primary residence to go

---

14. N.T. at 41.

15. N.T. at 45. See also, N.T. at 45-46 ("So as we have done in the past, she would during that short period of time when she was overseeing work, she would generally stay there at night. And that's the way it was there.").

from St. Joseph's Way at the time of settlement to a place in Rittenhouse Square. That's where we were looking to have our primary residence." [16]

In March 1998, Mr. Weinberg testified, he and his wife moved into his stepson's condominium on Pier 5.[17] Mrs. Weinberg subsequently purchased this condominium from her son on April 30, 1998. Meanwhile, her son and daughter-in-law moved out to the Bala Cynwyd property at Sandringham Road, where they remained from March 1998 until it was sold in October 1998. They paid for the utilities and had the phone number changed. N.T. at 88-89.

After this move to the condominium, Mr. Weinberg no longer spent any time at the Bala Cynwyd property except for perhaps one visit. Moreover, although he did not have a clear recollection of how much time Mrs. Weinberg spent at the suburban property, he believed "it was very limited." N.T. at 45, 89.

This testimony thus establishes that beginning in April 1996, the Weinbergs purchased and resided within Philadelphia at St. Joseph's Way. The burden was thus on the petitioner to establish that Mr. Weinberg changed his residence since "[a] domicile once acquired is pre-

_____

16. N.T. at 42. Mr. Weinberg further testified that around October 1997, his St. Joseph's Way home was under agreement of sale but all parties to this transaction agreed to delay settlement until April 1998. N.T. at 39-40, 48. He nonetheless stated that during the period of January and February 1998, he split his time between the Society Hill and Bala Cynwyd properties. N.T. at 46.

17. In explaining this move to Pier 5, Mr. Weinberg stated: "[W]e decided to do [move] because we could not find a property that we wanted and therefore we decided it would be a good opportunity to move our primary residence from St. Joseph's Way to the river because we had never had that experience. We decided to purchase the property from him." N.T. at 44.

sumed to continue until it is shown to have been changed and where a change is alleged, the burden of proving it rests upon whoever makes the allegation." *In re Prendergast, supra,* 543 Pa. at 506, 673 A.2d at 327-28 (quoting *Dorrance's Estate,* 309 Pa. 151, 163 A. 303 (1932)). Petitioner sought to meet this burden with various documents.

Petitioner's counsel thus questioned Mr. Weinberg about a Jeep he purchased in Lansdale in February 1998 with title and registration in his own name indicating a Bala Cynwyd address.[18] He explained that this was a gift for his wife, which was why the title and registration were subsequently switched to her name since "she was not there I believe to sign the papers." N.T. at 47. He further explained that the reason he had given the Bala Cynwyd address for the Jeep was that his St. Joseph's Way home was under agreement of sale at this time. N.T. at 48. This response is not inconsistent with his actual residence in Philadelphia at Pier 5 and must be considered within the context of the totality of the evidence presented at the hearing.

Petitioner's counsel also questioned Mr. Weinberg about the "financing package" that he had with Jefferson Bank and the Sandringham address listed on these documents.[19] Mr. Weinberg replied that "[t]here were docu-

---

18. N.T. 47. Petitioner presented documents relevant to this questioning. See exhibits F-4 and F-5.

19. See N.T. at 55-64. Mr. Weinberg was questioned initially about a settlement statement, exhibit F-16 and then counsel entered into a discussion of possible stipulations as to this document and exhibit F-15. *Id.* at 59-64. Petitioner's counsel when asked if a stipulation was acceptable stated: "I think the only thing I would like to have as long as Mr. Weinberg and counsel are in agreement, is that when these documents were signed by Mr. and Mrs. Weinberg I presume they did not at any time object to Jefferson Bank as listing the

ments that were prepared by Jefferson Bank for the property which I signed and there was a financial statement that I had to actually fill out completely which I did and was signed by me." N.T. at 56. In contrast to these loan documents that Mr. Weinberg characterized as being prepared by Jefferson Bank dated December 4, 1997 that give the borrowers' address as Sandringham Road, Penn Valley, exhibits F-15 and F-16, Mr. Weinberg presented a personal financial statement that he personally filled out: this handwritten form lists "home address" as 267 St. Joseph's Way.[20]

These documents prepared by the bank, alone, do not rebut Mr. Weinberg's testimony as to where he physically resided. The petitioner had the option to produce evidence—or testimony—as to this key element in her burden of proof but elected not to do so. Actual physical residence is, of course, a crucial aspect of establishing legal residency or domicile. In *Lesker Case,* for instance, the Pennsylvania Supreme Court concluded that objections to a nomination petition were without merit when based on such evidence as a motor vehicle license, a liquor license and telephone directory address

---

borrowers' address and I note that it's the borrowers' address, not the address of the property, that's the subject of the loan in terms of how the documents were prepared." *Id.* at 63-64.

20. See 2 N.T. at 4-5, where counsel for Mr. Weinberg included this personal financial statement dated "November 10, 1997" among the exhibits stipulated by agreement. The exact genesis of exhibit F-16, the "settlement statement," is unclear from its face. Without correction by plaintiff's counsel, however, Mr. Weinberg characterized it as being prepared by the bank. See N.T. at 58-59. The petitioner also introduced into evidence by stipulation two Jefferson Bank mortgage documents as well as a deed for the Sandringham property. See exhibits F-1, F-2 and F-3; 2 N.T. at 3.

without the requisite proof of an actual physical abandonment of the legal domicile:

"The record shows that he [the candidate] never abandoned his 1814 Brownsville Road home. His furniture, personal belongings and clothes are still there; his housekeeper who cared for himself and his wife [are still] there; he votes from this residence; he receives his friends and acquaintances there.

*"To accomplish a change of domicile there must be not only the animus to change but the factum as well. There must be an actual transfer of bodily presence from one place to the other.* The animus and the factum do not need to be simultaneous, but until they coincide the change of domicile is not effected. *In the law a domicile is as deep rooted as a tree and to transfer it from one location to another requires an operation as intensive as the digging up, loading, transportation, and replanting of an elm or maple." Lesker Case,* 377 Pa. 411, 418-19, 105 A.2d 376, 380 (1954). (emphasis added)

In testifying as to his actual physical residency, Mr. Weinberg consistently testified that during the period he owned the Bala Cynwyd property, his primary residence was in Philadelphia—whether at St. Joseph's Way or later at Pier 5. As evidence of this actual physical residency, he testified that once he moved to 267 St. Joseph's Way, he changed his voter registration to that address and then voted in Philadelphia in each election. When he moved from Society Hill to Pier 5, he once again changed his voter registration. N.T. at 78-79. He stated that after his purchase of the Bala Cynwyd property, the bulk of his clothing remained at the St. Joseph's Way property although he kept some at Sandringham since "I would spend some nights there." N.T. at 80.

As for entertaining, Mr. Weinberg stated that they did not entertain people at the Sandringham property, but they had entertained people "many times" at the St. Joseph's Way property. N.T. at 80. Mr. Weinberg also presented informal telephone directories for the Court of Judicial Discipline with attached memoranda dated January 12, 1998 and April 1, 1998 listing his address as St. Joseph's Way in Philadelphia.[21] By stipulation, it was admitted that Mr. Weinberg had been chairman of the Democratic party in Philadelphia. He was a member of the Philadelphia Bar Association and not the Montgomery County Bar Association.[22] Finally, in filing their state and federal income tax returns for the years 1996, 1997 and 1998, the Weinbergs listed their respective Philadelphia residences as their addresses.[23] This testimony as to his actual physical residence weighs heavily in the calculation of Mr. Weinberg's residence. In *In re Prendergast,* for instance, the Supreme Court suggested that where a person registers to vote

---

21. See N.T. at 91-92 and exhibits W-4 and W-5. These directories apparently were presented to rebut an internal Obermayer firm directory, exhibit F-7. Mr. Weinberg denied any knowledge of how these addresses were compiled. He stated that this was something his secretary would handle and "I did not tell her to change that address. She did that on her own." *Id.* at 52. This was the only testimony on the generation of this firm telephone list, and thus stands unrebutted by petitioner. Moreover, this testimony was elicited by petitioner's counsel as on cross-examination and she is thus bound by it unless contradicted. *Gorfti v. Montgomery,* 384 Pa. Super. 256, 260-61, 558 A.2d 109, 111 (1989), *appeal denied,* 524 Pa. 608, 569 A.2d 1367 (1989) ("In Pennsylvania, a party calling a witness as of cross [examination] is bound by the testimony thus evoked unless it is contradicted by other evidence, not limited to direct testimony, or is inherently incredible.").

22. N.T. at 82.

23. See N.T. at 95-96 (stipulation by counsel).

and actually votes is a strong indicia of residency. *In re Prendergast, supra,* 543 Pa. at 506, 673 A.2d at 328.

In resting petitioner's case after the testimony of Mr. Weinberg, petitioner argued that by virtue of Mrs. Weinberg's presence at the Bala Cynwyd property, this court should find that Mr. Weinberg, as her husband, likewise established Bala Cynwyd as their primary residence under the precedent that a married couple may have only a single residence. 2 N.T. at 10. In support of this argument, petitioner referenced "a case on point" that her counsel had referred to this court, which presumably is *McCarthy v. Philadelphia Civil Service Commission,* 19 Pa. Commw. 383, 339 A.2d 634 (1975).[24]

The facts of *McCarthy,* however, are clearly distinguishable. In *McCarthy,* a fire lieutenant was dismissed for failure to meet the Philadelphia residency requirements under the Philadelphia Code of Ordinances §20-101. He and his wife had owned property in both New Jersey and Philadelphia. After their Philadelphia home was vandalized, his wife and nine children moved to New Jersey. McCarthy moved in with his mother, and

---

24. See generally, 2 N.T. at 9-10. The *McCarthy* case was among several excellent cases that counsel forwarded to this court in advance of the hearing. Another case with facts similar to those of *McCarthy* is *In re Nomination Petition of Carabello,* 102 Pa. Commw. 129, 516 A.2d 784 (1984). In *Carabello,* the Commonwealth Court concluded that the candidate for the Ward Executive Committee for the Democratic party in Philadelphia did not meet the residency qualifications where he claimed his mother's home as his residence rather than the home of his wife and child. In rejecting the candidate's argument that he was the "padrome" of the family, the court invoked the general rule that the place where the family of a man or woman lives shall be considered his residence. 25 P.S. §2814(d). The facts of the Weinberg case differ, however, since Mrs. Weinberg's tenure in Bala Cynwyd was temporary and it was Mr. Weinberg who remained in the presumptive legal residence.

claimed her house as his residence. In testimony, however, he conceded that he typically slept two nights in his mother's home, two nights at the fire station and three nights in New Jersey. The Commonwealth Court concluded that he was not a Philadelphia resident based on the following considerations: he no longer owned any property in Philadelphia; he spent on average as much time in New Jersey as at his mother's house; he continued to maintain a marital relation with his wife and was the family's sole support; his children attended school in New Jersey. *McCarthy, supra,* 19 Pa. Commw. at 389-90, 339 A.2d at 637.

The Weinbergs, in contrast, consistently maintained property in Philadelphia; they gave their Philadelphia address on their income tax forms for the relevant time period; Mr. Weinberg was registered to vote in Philadelphia and consistently did so. And most significantly, unlike the spouse in *McCarthy,* the evidence presented does not indicate—let alone establish—that Mrs. Weinberg took up permanent residence in Bala Cynwyd. Rather, Mr. Weinberg characterized her occupancy of the Bala Cynwyd house as part of a pattern of temporarily leaving the primary residence to renovate a property for investment purposes. N.T. at 40-46. As Mr. Weinberg testified, "[s]o as we have done in the past, she would during that short period of time when she was overseeing work, she would generally stay there at night. And that's the way it was there." N.T. at 45-46. Moreover, he testified that she returned to live at Pier 5 in March 1998, at which time her son and his wife took up residence in Bala Cynwyd.

These facts are patently distinguishable from the *McCarthy* case where there was no indication of any intent by the wife to return to Philadelphia to live with

her husband.[25] In the instant case, in contrast, Mrs. Weinberg returned to Philadelphia after approximately three months of supervising renovations at Bala Cynwyd. As the Supreme Court observed in *Prendergast,* "[a]n established domicile, however, can be retained without physical presence or residence *until it be proven that a new domicile has been acquired." In re Prendergast, supra,* 543 Pa. at 506, 673 A.2d at 328. (citation omitted) (emphasis added) Similarly, the Election Code's "rules for determining residence" of electors, which have been applied by the courts in determining the residency of candidates,[26] emphasizes that temporary absences from the primary residence do not result in a change of domicile:

"A person shall not be considered to have lost his residence who leaves his home and goes into another state or another election district of this state *for temporary purposes only, with the intention of returning."* 25 P.S. §2814(b).

The only evidence as to Mrs. Weinberg's purpose in going to the Bala Cynwyd property was through

---

25. In addition to *McCarthy,* the Election Code's "rules for determining residence" for electors provides that "[t]he place where the family of a married man or woman resides shall be considered and held to be his or her place of residence, except where the husband and wife have actually separated and live apart . . . ." 25 P.S. §2814(d). This rule, however, likewise requires a finding of "residence" as to the spouse who leaves one residence for another. The rules further provide: "That place shall be considered the residence of a person in which his habitation is fixed, and to which, *whenever he is absent, he has the intention of returning."* 25 P.S. §2814(b). (emphasis added) Mrs. Weinberg's return to Philadelphia in March 1998 is practical, physical evidence of her intention as to which location was her legal residence. Petitioner, moreover, failed to present evidence that would rebut such a conclusion.

26. See note 6, *supra.*

the testimony of Mr. Weinberg. He testified as to its temporary nature, and her return to their Philadelphia home in March 1998 buttresses this testimony. For this reason, as well, petitioner failed to meet her burden of proof as to an essential element in establishing her objections to Mr. Weinberg's nomination petition.

## CONCLUSION

A determination of legal residency necessarily requires balancing the facts of a particular case. The credible testimony and evidence amply demonstrate that Mr. Weinberg's legal residence was at all times in Philadelphia during the three-year period at issue—either at St. Joseph's Way beginning April 1996 or at Pier 5 from March 1998 through the present. Among the many factors supporting this conclusion are the following continuous activities of Mr. Weinberg in Philadelphia: maintenance of personal bank accounts; membership in the Philadelphia Bar Association; registering to vote in Philadelphia; voting in Philadelphia; consistent ownership of a personal residence within the city; entertaining therein and not elsewhere; maintenance of furniture, clothing and personal items in the Philadelphia residence and, importantly, physically residing in those Philadelphia residences. Had many—not necessarily all—of these activities occurred at a residence outside of Philadelphia, a different result would be compelled. The mere registration of one vehicle at the Bala Cynwyd address or the reference in bank-prepared loan documents to that address fall far short of meeting the requirements for changing legal residence.

The temporal and brief partial absence of Mrs. Weinberg from the marital domicile for the express purpose of supervising the completion of an invest-

ment property in Bala Cynwyd is insufficient as a matter of law to constitute a change of domicile either for her or Mr. Weinberg. Moreover, the 20-year history of Mrs. Weinberg supervising renovations of at least 15 investment properties purchased by the Weinbergs is consistent with the circumstances and events in this matter and corroborative of the stated intent of Mr. Weinberg to be domiciled in Philadelphia.

Accordingly, this court finds that petitioner has failed to prove by a preponderance of the evidence that Mr. Weinberg was not domiciled in Philadelphia and it is therefore ordered and decreed that the objections to Mr. Weinberg's nominating petition are dismissed with prejudice.